IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 04-10938 (ESL) |
| EL COMANDANTE MANAGEMENT COMPANY, LLC, et al., | CHAPTER 11 |
| | (Jointly Administered) |
| Debtors. | |

FILED & ENTERED

MAY 3 0 2006

U.S. BANKRUPTCY COURT
SAN JUAN, PUERTO RICO

**OPINION AND ORDER**

This case came before the court on April 25, 2006, to consider the approval of Caribbean Thoroughbred Racing Company, Inc.'s Second Amended Disclosure Statement For Second Amended Joint Plan Of Reorganization For Debtors And Debtors-In-Possession El Comandante Management Company, LLC, Housing Development Associates, SE, and El Comandante Capital Corporation ("Caribbean's Second Amended Disclosure Statement") filed on April 22, 2006 (Docket No. 1091);[1] and the objections to Caribbean's First Amended Disclosure Statement filed by Wells Fargo Bank, National Association, in its capacity as Indenture Trustee (the "Indenture Trustee") (Docket entries No. 1047, 1084), the Treasury Department of the Commonwealth of Puerto Rico ("Treasury") (Docket No. 1048), and the Horse Racing Administrator of the Puerto Rico Horse Racing Industry and Sport Administration (the "Horse Racing Administrator") (Docket No. 1052). Caribbean replied to the objections to the First Amended Disclosure Statement (Docket No. 1090), and filed the Second Amended Disclosure Statement. For the reasons set forth below, Caribbean's Second Amended Disclosure Statement is hereby approved.

**Jurisdiction**

This court has jurisdiction to entertain Caribbean's request for approval its second amended

---

[1] Caribbean Thoroughbred Racing Company, Inc.'s ("Caribbean") First Amended Disclosure Statement was filed on March 16, 2006 (Docket No. 980). Caribbean informed the court that the Second Amended Disclosure Statement addresses all the objections raised by Treasury, and the Indenture Trustee. Caribbean filed the Second Amended Plan on April 22, 2006 (Docket No. 1092).

disclosure statement, pursuant to 28 U.S.C. §§ 1334 and 157. This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), and venue of debtors' jointly administered cases is proper in the District of Puerto Rico, pursuant to 28 U.S.C. § 1408(a), and the Order entered by the United States Bankruptcy Court for the District of Delaware, on October 22, 2004, wherein venue was transferred to this District, pursuant to 28 U.S.C. § 1412 (Docket No. 42).

**Background**

El Comandante Management Company, LLC ("ECMC"), Housing Development Associates, S.E. ("HDA"), El Comandante Capital Corporation ("ECCC") (collectively the "debtors"), filed for bankruptcy under Chapter 11 of the Bankruptcy Code on October 15, 2004. On January 25, 2006, Caribbean filed its disclosure statement (Docket No. 781). A hearing was held on February 21, 2006, to consider Caribbean's disclosure statement, and the objections filed by creditors and parties in interest (Minutes of February 21, 2006, Docket No. 921). On March 3, 2006, the court entered an Opinion and Order denying Caribbean's request for approval of the disclosure statement, because the proposed Chapter 11 plan failed to comply with the requirements of 11 U.S.C. § 1123(a)(4), making the proposed Chapter 11 plan unconfirmable (Docket No. 945).[2] The court allowed Caribbean twenty (20) days to file an amended disclosure statement and plan.

On March 16, 2006, Caribbean filed its first amended disclosure statement and plan (Docket No. 980). The Indenture Trustee, Treasury, and the Horse Racing Administrator filed objections to Caribbean's first amended disclosure statement and plan. Caribbean replied to the objections, and filed a Second Amended Disclosure Statement and Plan addressing the objections raised by the parties (Docket entries No. 1091, 1092). A hearing was held on April 25, 2006. The matter was taken under advisement.

---

[2]     Caribbean's disclosure statement and plan classified the general unsecured creditors and the unsecured deficiency claim of the Indenture Trustee in the same class *albeit* with a different treatment (Docket No. 781).

-2-

## Caribbean's Second Amended Disclosure Statement and Plan

Pursuant to the Second Amended Joint Plan Of Reorganization For Debtors And Debtors-In-Possession El Comandante Management Company, LLC, Housing Development Associates, SE, And El Comandante Capital Corp. ("Caribbean's Second Plan"), Caribbean will pay $67 million for the purchase of substantially all of debtors's assets ("Asset Purchase Agreement")[3], and a deferred compensation under the Earn-Out Agreement ("Earn-Out Compensation").[4] The bondholders will receive $59-$60 million from Caribbean's purchase price for debtors' assets. The tentative breakdown provided by Caribbean is as follows:

| | |
|---|---:|
| Value of Wells Fargo's security interest: | $64,000,000 |
| Adequate protection payments: | (8,700,000) |
| Face value of ECMC's notes: | (6,700,000) |
| Estimated Rent paid, as of September 2006: | (3,000,000) |
| Payment of deficiency claim: | 13,700,000 |
| (Unidentified funds) | 750,000 |
| *Estimated total distribution amount:* | *$59-60 million* |

Caribbean's second plan also provides to pay in full all the allowed administrative claims, allowed other secured claims, allowed priority tax claims, and other allowed priority unsecured claims; and, an initial distribution to the allowed general unsecured claims against creditors of ECMC and HDA. The reserve funds to pay these claims have been increased under the second plan, and Caribbean has indicated that the company and its investors have the resources to adjust

---

[3] Caribbean's Asset Purchase Agreement is $3 million more than the one proposed by the Indenture Trustee in its proposed plan and sale to Camarero.

[4] The Earn-Out Agreement contemplates the creation of a trust by the purchaser of the racetrack and other assets. The funding of the trust is contingent on the Puerto Rico Government's approval of regulations to govern the installation and operation of the video-games machines. Otherwise the new owner will have to fund the trust. The trust must be established within five (5) years from the effective date of the plan. However, the Earn-Out Agreement requires that Caribbean must obtain a license to operate the racetrack. Distribution to the beneficiaries of the trust will be made within ten (10) years from the "Trigger Event" date, which is the date when the purchaser of the debtors' assets has installed at least 500 VGMs on or off the premises of the racetrack; provided, that the new legislation is enacted and the purchaser has obtained all the necessary governmental permits for the installation and operation of the equipment. The court notes that Caribbean's request for a license to operate El Comandante Racetrack has been denied by the Horse Racing Board.

- 3 -

and/or increase the reserves, if necessary. The second plan also contemplates an extension of the preliminary injunction issued on behalf of the debtors, in order to operate the racetrack under ECMC's management up to the effective date of the plan, which is 90 days from the date that the confirmation order becomes final and unappealable. The source of funds to close the Asset Purchase Agreement is a credit facility by Westernbank Business Credit in the amount of $73 million dollars. The financing is not contingent on Caribbean obtaining a license to operate a racetrack.

### Applicable Law and Discussion

**I.     Standards to approve a disclosure statement under 11 U.S.C. § 1125(a)(1).**

Pursuant to 11 U.S.C. § 1125(a)(1)[5] a disclosure statement must contain adequate information for its approval. "The determination of what is 'adequate information' in a disclosure statement is a practical and variable inquiry made on a case-by-case basis. . . . Beyond the statutory guidelines described in § 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy." (Citations omitted.) *In re Aspen Limousine Service, Inc.*, 193 B.R. 325, 334 (D. Colorado 1996). When determining whether the information provided in the disclosure statement is adequate the court should evaluate the information in light of the particular circumstances of the case and the "need for a quick solicitation and confirmation." 4 *Norton Bankr. L. & P. 2d* § 86.22. In this case there are now three competing plans. Each plan proponent has, as of the date that their respective disclosure statements were approved, the financial resources to fund the plan proposed and offer a payment plan to the bondholders and other creditors. The route to approval of each of the disclosure statements, as well as most of the motions in this case, have been marked by substantial litigation. The proposed plans should all reach the confirmation stage

---

[5]     Section 1125(a)(1) of the Bankruptcy Code defines adequate information as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable [a creditor] of the relevant class to make a judgment about the plan, but adequate information need not include such information about any other possible or proposed plan."

as soon as possible, and allow the bondholders, creditors, and parties in interest, to express their opinion as to which plan they prefer.

Whether or not the information provided in the disclosure statement is adequate is determined by the Bankruptcy Code, and "is not governed by any otherwise applicable nonbankruptcy law, rule or regulation, ... ." 11 U.S.C. § 1125(d). *See also In re Public Service Company of New Hampshire*, 43 F.3d 763, 766 (1st Cir. 1995). In *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pennsylvania 2001), the court held that "adequacy of the disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources." (Citation omitted.) In this case the adequacy of the information disclosed hinges on how creditors will be paid and the source of funds to make the payment. Caribbean's second amended disclosure statement and plan provide adequate information on how the claims are classified and how much each class will receive. There is also adequate information regarding the source of funds to purchase the debtors' assets, that is, the credit facility by Westernbank Business Credit. Those are the same key factors in the disclosure statements submitted by the Indenture Trustee and the debtors, and which were approved by the court. All three plans will fund payment to creditors through the purchase of debtors' assets.

The approval of a disclosure statement requires due notice and a hearing. *See* 11 U.S.C. § 1125(b), and Rules 2002(b)(1), 3017(a) and (b) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."). "A disclosure statement may only be approved after notice and hearing, Fed.R.Bankr.P. 3017(a), and then only if it includes 'adequate information.'" *Phoenix*, 278 B.R. at 392, and Fed.R.Bankr.P. 3017(b). Although the second amended disclosure statement was filed only three days prior to the hearing, the court finds that creditors and parties in interest had a

- 5 -

meaningful opportunity to oppose, and in fact did so.

At the hearing on the approval of a disclosure statement, the court may consider issues pertaining to the plan, and may rule upon such issues, when the plan defects will make it unconfirmable, *In re Felicity Associates, Inc.*, 197 B.R. 12, 14 (Bankr. D. Rhode Island 1996), that is, when the "plan is so fatally, and obviously flawed that confirmation is impossible." *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Massachusetts 2002). *See also Phoenix*, 278 B.R. at 394. The court may disapprove a disclosure statement that contains adequate information, when the proposed plan "cannot possibly be confirmed." *In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Maryland 2000). Relevant issues pertaining to the plan are classification of claims, an artificial classification of a claim, whether the plan unfairly discriminates against a class of claims, and the solicitation procedure. *See In re Hillside Park Acts., L.P.*, 205 B.R. 177 (Bankr. W.D. Missouri 1997). Thus, it is within this court's discretion to address these issues prior to the confirmation of the plan.

This court is conscious that based on the above legal premise, it denied Caribbean's original disclosure statement. However, the second amended plan is not plainly unconfirmable. Confirmation issues will be considered at the confirmation hearing. This matter is addressed more fully below.

## II.    Standing to file a Chapter 11 Plan

A crucial issue before the court is whether or not Caribbean has standing to propose a plan of reorganization for HDA and ECCC, when Caribbean is not a creditor in these cases. Section 1109(b) provides that any party in interest "may raise and may appear and be heard on any issue in a case under this chapter." Section 1121© provides that any party in interest may file a plan provided that a trustee has been appointed; the debtor has not filed a plan within 120 days from the

- 6 -

date of the order of stay; or the debtor's plan has not been accepted before 180 days after the date of the order of stay, by each class of claims or interests that is impaired under the plan. Section 1121© of the Bankruptcy Code provides the circumstances when a party in interest may file a plan. "If the debtor loses his or her exclusive right to file a plan, then 'any party in interest' may file one." 4 *Norton Bankr. L. & P. 2d* § 88:4. The Legislative History of section 1121© is silent as to who is a party in interest, aside from the persons or entities enumerated in the statute. Congress only states that the list that appears under section 1121© of the Code, is not exhaustive, allowing the courts a broad discretion to consider any relevant factors in order to determine who is a party in interest. *See Bankruptcy Reform Act of 1978*, P.L. 95-598, U.S. Code Cong. & Admin. News 1978, p.p. 5963 et seq..

Caribbean purchased a claim postpetition, thus becoming a creditor of ECMC's estate pursuant to section 101(10)(A) of the Bankruptcy Code.[6] A creditor is specifically listed as a party in interest in section 1109(b); thus, Caribbean is a party in interest in ECMC's case. The Indenture Trustee alleges that Caribbean is not a creditor of HDA's and ECCC's estates, and may not propose a plan in their cases. Caribbean argues that it is a party in interest in debtors' estates because it holds a direct financial stake in all the debtors' estates, as the proposed second amended plan contemplates the purchase of substantially all the debtors' assets, including HDA's and ECCC's.

---

[6] "The term [party in interest] has been held to include general and limited partners who owned over 99 percent of the debtor, a party who purchased a claim and became a creditor even if it was acquired postpetition for the express purpose of acquiring standing to file a plan, ... ." Id. In *In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 972 (Bankr. D. Idaho 1993), the court held that the term "party in interest is expandable, and its application must be determined on a case-by-case basis." (Citation omitted.) In *Rook*, the debtor and a creditor filed competing plans. The debtor alleged that the creditor did not have standing to file a plan, as it became a creditor by purchasing claims postpetition. The court held that the creditor was a party in interest with standing to file a plan under section 1121(c), regardless of whether the proponent of the plan became a creditor and a party in interest through transfers of claims postpetition. *Rook* followed the analysis of *In re First Humanics Corp.*, 124 B.R. 87, 91-93 (Bankr. W.D. Mo. 1991), and held that "a party who purchased claims against the debtor postpetition had standing to present a plan of reorganization, even though the sole reason for the purchase of the claims was to insure such standing." In *First Humanics*, the court also held that the determination of whether an entity qualifies as a party in interest "must be made in light of the specific reorganization context for which the determination is sought." (Citations omitted.) 124 B.R. at 90.

We agree.

The Bankruptcy Code does not define the term "party in interest," it only lists who may be a party in interest. Sections 1109(b) and 1121© provide that "party in interest" includes the debtor, a chapter 11 trustee, creditor, creditors' committee, equity security holders's committee or indenture trustee. The list sections 1109(b) and 1121© is non-exclusive.[7] 4 William L. Norton, Jr. *Norton Bankruptcy Law And Procedure 2d* § 80:2 (2006). *See also In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). Generally, any person or entity, who holds a financial stake in the outcome of the debtor's estate, is a party in interest. *See* 7 Lawrence P. King, *Collier on Bankruptcy*, ¶ 1109.02[1] 15ᵗʰ Revised Edition 2006. A person who has a "significant legal stake" in the debtor's estate, as opposed to a financial stake, is also a party in interest. *Collier* ¶ 1109.02[1]. In *In re Overview Equities, Inc.*, 240 B.R. 683, 686-687 (Bankr. E.D.N.Y. 1999), the court followed the test set forth in *Amatex*, to determine whether a party qualifies as a "party in interest," a determination to be made on a case-by-case basis. "The test employed under section 1109(b) is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'" (citing from *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)). Thus, the right of "individual stakeholders to have a voice in the chapter 11 process is fundamental." *Collier* ¶ 1102.02[2][a].

While the concept of "party in interest" should be interpreted broadly to allow parties affected by the outcome of the case, to appear and be heard, *Overview*, 240 B.R. at 686-687, "principles of standing do properly apply to limit the scope of section 1109(b)." *Collier* ¶ 1109.01[3]. The concept of "party in interest" under sections 1109(b) and 1121© are the same.

---

[7] Other parties not included in section 1109(b), but who may be considered a party in interest is "a regulatory agency with supervisory responsibilities over the debtor's business or financial affairs." *Collier* ¶ 1109.02[1]. Such is the case of the Horse Racing Administrator and the Horse Racing Board.

- 8 -

*Collier* ¶ 1121.05[2]. The determination of who is a party in interest, is made by the court on a fact finding process, and it is determined on a case-by-case basis, after considering whether or not the person has sufficient stake in the outcome of the case. Id. Pursuant to Caribbean's plan, the outcome of each of the debtors' cases directly affects the outcome of ECMC's Chapter 11 case, wherein Caribbean is a creditor. Such combined effect places Caribbean within a "zone of interest" sufficient to grant it standing to appear in the three cases and propose a consolidated plan for the purchase of all assets. *Collier* ¶ 1109.04[4].

Caribbean became a creditor and a party in interest of ECMC's estate through a postpetition claim transfer. Clearly, Caribbean has standing to propose a plan for ECMC as a party in interest under section 1121©. The plan proposed by Caribbean directly affects the estates of ECMC, HDA and ECCC, as the plan contemplates the purchase of substantially all the debtors' assets, and the purchase of the bondholders' notes. Caribbean's proposed plan cannot be effective without considering HDA's and ECCC's estates. Under Caribbean's Second Amended Disclosure Statement, the three estates are at stake. Upon the closing of the asset purchase agreement, the three estates will become one, with a new owner who will assume the claims of the debtors. Caribbean cannot purchase the assets of ECMC without having a direct impact on the estates of HDA and ECCC, who own and manage the premises where ECMC operates. Caribbean has sufficient financial stake in the debtors' estates, as the implementation of the plan depends in the outcome of all three bankruptcy cases. Based on the provisions of section 1109(b), a broad application of standing, and the zone of interest test, the court finds that Caribbean is a party in interest in the estates of HDA and ECCC, as Caribbean holds a direct financial stake in the outcome of the debtors' cases, and the feasibility of the plan. Therefore, the court finds that Caribbean has standing to propose a plan in all three cases (ECMC, HDA, and ECCC).

### III.    Objections

The Indenture Trustee centers the inadequacy of the information on confirmation issues that will render the plan unconfirmable.    The Indenture Trustee alleges that the disclosure statement fails to provide adequate information on certain critical issues: (1) improper classification and unfair treatment of claims filed against the debtors; (2) lack of basic information necessary for the typical investor to determine whether the proposed plan is feasible, such as, (a) the license requirement to operate the racetrack, (b) the entity that will operate the racetrack in the event that Caribbean does not obtain a license, © the unlikelihood that said license will be issued to Caribbean, (d) the prejudicial treatment provided to the Indenture Trustee's secured and unsecured claims, (e) Caribbean's obligation to satisfy the Indenture Trustee's administrative expense claim, (f)) the treatment and estimated amount of allowed claims and the potential impact of allowance of disputed claims on distributions to be made pursuant to, and the feasibility of, the amended plan, (g) risks related to the confirmation of the plan, (h) the terms and conditions regarding the postconfirmation relation between Caribbean and ECMC, (I) the amount of distribution to be made to creditors and the timing of such distributions, (j) availability of the $1.5 million to the unsecured creditors, in the event that Caribbean does not obtain a license, after the appeal process is final, (k) the scope and extent of the Indenture Trustee's lien, (l) the impact of the rejection of the lease entered into by HDA and ECMC, as well as the Indenture Trustee's pending motion for appointment of a chapter 11 trustee for debtors' gross negligence in allowing the lease to expire and be deemed rejected, while under the leadership of Charles Cuprill, (m) Caribbean's non-compliant and improper balloting and voting procedure, (n) the future management of Caribbean, and (o) inadequate and unjustified release provisions.

Treasury claims that: (a) it disagrees and objects to the treatment and/or amount

- 10 -

acknowledged by Caribbean to Treasury's claim number 77; (b) the amount anticipated by the debtors as tax priority claims is lower than the amount reflected in the Claims Register against ECMC; © Caribbean claims that the Indenture Trustee has objected to Treasury's claim number 77, but the record reflects that the court has allowed Treasury's claim as filed; (d) Treasury objects to the funding of the Allowed Priority Tax Claim Reserve as it is insufficient to pay Treasury's claim, or any other claims, notwithstanding that Caribbean reserves the right to increase the amount of the reserve, if necessary; (e) Treasury objects that if the amount of allowed claims is greater than the amount projected by debtors, then the holders of the allowed claims will receive "a reduced percentage of recovery," no distinction is made as to what class of claims will be adversely affected by this reduction in recovery, thus, this provision is unacceptable to Treasury; (f) Treasury claims the Bankruptcy Code does not alter Puerto Rico tax law, thus, Treasury has the right to impose penalties and surcharges, among others, as provided in the Puerto Rico Internal Revenue Code; and, (g) Treasury also objects to the payment terms of the proposed plan because it does not provide for creditors to receive a value equal to the allowed amount of their claims, pursuant to 11 U.S.C. § 1129(a)(9)©.[8]

The Indenture Trustee argues that even if the plan is confirmed, Caribbean will not be able to operate the racetrack, as it is unlikely that the Horse Racing Board will issue a license to Caribbean. Treasury claims that: (a) Caribbean fails to set forth in the disclosure statement any legal basis or any other reason why the preliminary injunction issued on behalf of the debtors to operate the business shall be extended indefinitely to Caribbean by reason of the endeavors of an entity that is not the debtors; (b) the effective date of the plan is uncertain and remote, since the "administrative

---

[8] Caribbean has clarified, and the court has also stated, that Treasury's claim will be paid as agreed to by the parties, or as required by applicable law, and in the amounts finally adjudicated in a contested matter or adversary proceeding. Consequently, payment of Treasury's claim is more a confirmation issue than a disclosure deficiency.

and judicial efforts in connection to the license, ... may take years," (c) inconsistencies on the definition of effective date of the plan that appears in the first amended disclosure statement *versus* the definition that appears in the first amended plan, notwithstanding that the effective date of the plan is not contingent on having a license to operate the business; (d) Caribbean fails to include the litigation pending between the debtors and Treasury; (e) the "tax exemptions" and the "transfer taxes" provisions are ambiguous, as they fail to describe what type of transactions may be subject to tax exemptions and which are not; and, (f) Caribbean reserves the right to modify the confirmed plan, without any requirement of intervention from the court.

The Horse Racing Administrator alleges that Caribbean conditions the continued operation of the racetrack on the court's extension of the preliminary injunction that was issued on behalf of the debtors to operate the business. However, the "Administrator maintains is highly unlikely to occur, that is, that the Bankruptcy Court will agree to a-priori extend an indefinite future (that is, until Caribbean exhausts its procedural, appellate and legal rights in reference to the denial of the application for a permanent license to operate the Racetrack - which as is well known, and has been conceded by Caribbean, may be years down the road) ... ." *See* Party In Interest's Objection To Caribbean Thoroughbred Racing Company, Inc.'s, First Amended Disclosure Statement (Docket No. 1052) at p. 3.[9] The Administrator also argues that it is his duty to protect the horse racing industry in Puerto Rico, and "that it has always been the government's position that if at any time the Racetrack land and property is at imminent risk of being converted for any use other than for conducting horse racing, ... it will stand ready to protect the industry by expropriating the land if

---

[9] The court will not comment on this speculative argument, which, in any event, may be a confirmation issue.

need be." Id. at p. 6.[10] Lastly, the liquidation analysis includes the amount of the Poolpote as property of the estate, and it is the Horse Racing Administrator's position that the Poolpote funds are trust funds over which the debtors does not have exclusive signatory authority, and the use of said funds are governed by specific Resolutions of the Horse Racing Board. To the extent that Caribbean's financing and source of funds to complete the Asset Purchase Agreement are not contingent on obtaining a license, the objection will not defeat approval of the disclosure statement. Ultimately, it only affects the creation of an earn-out trust. Whether or not the Poolpote is part of the estate will not be decided at this stage. Particularly, when such a determination may be mooted by the particular facts existing at a given point in time, whether there will be a liquidation, and whether it is still unclaimed because no one has won it.[11] In any event, the disclosure is made for liquidation analysis purposes only, and not as a request to determine whether the Poolpote is, at this time, property of the estate.

The court finds that the above objections are aimed at the confirmation of the proposed plan than to the adequacy of the information. Hence, they may be presented at such time. Notwithstanding, the court will address some of the objections herein below.

The Indenture Trustee alleges that the treatment provided to its secured claims is discriminatory based on the value assigned to its claim, and the proposed distribution under the second amended plan. Caribbean states that the valuation of debtors' assets is pending. Ultimately,

---

[10] The court will necessarily address this issue in the pending separate contested matter and adversary proceeding. However, the statement is not one which impacts the adequacy of the information in the disclosure statement. Notwithstanding, the court notes that the Administrator's position is subject to debate in light of the recent decisions by the Supreme Court of the United States in *Kelo v. City of New London*, 125 S. Ct. 2655, 162 L. Ed. 2d 439, ___ U.S. ___ (2005); and *Central Virginia Community College v. Katz*, 126 S. Ct. 990, 163 L. Ed. 945, ___ U.S. ___ (2006).

[11] There may be a legal difference when there are on going operations of the racetrack and a person has won the Poolpote but has not claimed the prize, from the scenario when there is a liquidating debtor, the racetrack is not operating, and no one has won the Poolpote.

- 13 -

payment on the Indenture Trustee's secured claim will depend on the value of the claim as allowed by the court. The greater the amount paid to the Indenture Trustee as a secured creditor, the amount available for distribution to other creditors is less. Under the second amended plan, the secured portion of the Indenture Trustee's claim is estimated in $44,330,699.04 based on the purchase offer of $64 million made by Camarero Race Track, Corp. ("Camarero"), and accepted as the value of the debtors' assets by the Indenture Trustee. The deficiency claim of the Indenture Trustee is estimated in $25 million, that is, $89 million (the total amount claimed by the Indenture Trustee) less $64 million (estimated value of the Indenture Trustee's secured claim). In addition, the amount for adequate protection payments already made to the Indenture Trustee, including the estimated payments to be made until September 2006, and the amount corresponding to the face value of ECMC's notes, must also be deducted from the value of the Indenture Trustee's secured claim. The second amended plan provides reserve accounts for the payment of the Indenture Trustee's claims, as follows: $44,330,699.04 for the secured portion of the claim, and $13,471,271.52 for the deficiency claim. The Indenture Trustee may disagree with the treatment of its claim, but the information related to said treatment is adequate under the circumstances, and sufficient to place the bondholders in a position to vote on Caribbean's plan.

The Indenture Trustee also alleges that Caribbean's liquidation analysis shows that certain creditors will receive more under a chapter 7 liquidation that under the second amended plan. Caribbean argues that the Indenture Trustee's calculations are based on outdated information, and that the deficiency claim will receive more under a chapter 7 liquidation. Caribbean clarifies that the amount of the Indenture Trustee's claim as to ECMC has not yet been determined, thus, under the second plan, the amount has been estimated. Even if HDA's deficiency claim is attributable to ECMC, the amount left for all unsecured creditors, including the deficiency claim, would be

- 14 -

$7,504,513.00. Under Caribbean's second amended disclosure statement and second plan, two (2) reserve accounts will be established for the payment of the Indenture Trustee's secured and unsecured claims. Over $13 million have been allocated to cover the Indenture Trustee's unsecured claim. Therefore, the deficiency claim may receive more under Caribbean's second plan that under a chapter 7 liquidation. All other unsecured claims will also be paid in full. Lastly, Caribbean explains that all the calculations were prepared after having discussed them with Mr. Stanley Pinkerton, Debtors' Chief Financial Officer, and after taking into consideration all payments made or to be made by the debtors, on or before the confirmation of Caribbean's plan. The payment of rent as an administrative expense claimed by the Indenture Trustee will be deducted from the secured portion of the claim, thus, it was not taken into consideration in the liquidation analysis.

The court finds that the disclosure made by Caribbean as to the deficiency claim is adequate under the circumstances, and when compared to the disclosure statement submitted by the Indenture Trustee. The basis of the value is given, as well as the amount of the deficiency and how it will be paid. That the Indenture Trustee disagrees with the treatment does not carry the weight against its approval. To determine with more preciseness the extent of the deficiency will require a valuation hearing and a determination of the extent of the bondholders' lien on each of the estates.[12]

The Indenture Trustee also objects to Caribbean's second amended disclosure statement, as the second amended plan unfairly discriminates against the Indenture Trustee's claim, because the plan classifies the deficiency claim under a separate class from the class of the general unsecured claims. The court already discussed this issue when approving the debtors' third amended disclosure statement b. The court already discussed this issue when approving the debtors' third amended disclosure statement, based on sections 1122(a) and 1123(a)(4) of the Code, and in *In re Granada*

---

[12]     The court still fails to fully understand the Indenture Trustee's position that $67+ million will cause a lesser distribution to creditors than the $64 million proposed in the Indenture Trustee's plan.

- 15 -

*Wines, Inc.*, 748 F.2d 42 (1st Cir. 1984).(Docket No. 944). The same ruling applies herein. The classification may be permissible upon the particular circumstances of this case. The Indenture Trustee is not foreclosed from renewing its objection as one to the confirmation of the plan.

The Indenture Trustee demands payment of administrative expense claim based on the rent owed by ECMC. Debtors have consistently argued that the Indenture Trustee is not a direct creditor of ECMC, as any claim for rent will stem from HDA's assignment of the rent received from the lease agreement entered into with ECMC. Thus, the amount to be paid to the Indenture Trustee as an administrative expense, as well as to any other administrative claim, will come from the $67 million paid by Caribbean to the debtors under the Asset Purchase Agreement. Notwithstanding, Caribbean claims that the Indenture Trustee does not have an individual administrative claim against ECMC. This contested matter is before the court and will be ruled upon separately after submission of the legal memoranda. Such an issue, at best, may affect feasibility, but is not a bar to approval of the second amended disclosure statement.

The Indenture Trustee objects to the lack of feasibility of Caribbean's second plan based on Caribbean's inability to operate the racetrack. The second amended disclosure statement has been amended to provide that ECMC will continue operating the racetrack under the provisions of the preliminary injunction issued on behalf of the debtors, until the effective date of the plan. Thus, it will not be an "open ended" injunction, and no contract will be entered by Caribbean and ECMC. Caribbean also reaffirms that, regardless of the outcome of the license procedures, payment to creditors will be made on or before the Distribution Date specified under the plan, that is, fifteen (15) days after the effective date of the plan. The Indenture Trustee's allegation that the purchaser must have a license to operate the racetrack is incorrect. The court has not imposed such a condition to

- 16 -

confirm a plan.[13] Caribbean's President, Mr. Charles A. Cuprill Hernández ("Mr. Cuprill") testified that full payment to creditors is not contingent on having a license to operate the racetrack on the effective date of the plan. Moreover, Caribbean's financial commitment from Westernbank Business Credit is not subject to Caribbean obtaining a license to operate El Comandante Racetrack.

Disclosures as to the future management of the new company emerging from the asset purchase agreement are not relevant at this juncture, particularly when the new corporation may not manage or have a license to operate the racetrack. Attempts to insert negative connotations concerning the role that the Wilson family has had, or may have in the future, have no basis in the record. As of this date no party in interest has brought to the court any evidence of malfeasance, past or present, by the Wilson family. If any there was, the opposing parties had the opportunity to present it when Mr. James Wilson took the stand in a prior hearing. At that time not one question was posed to Mr. Wilson in cross examination.[14] In any event, the disclosure is that there is none.

The procedures as to solicitation and balloting, particularly from the beneficial holders of the bonds will be addressed separately. The court notes that the Indenture Trustee and the debtor were

---

[13]    This court has repeatedly stated the obvious, that a successful operation requires a licensed horse track, a licensed operator, and licensed horses. Any combination of two will not suffice. The Indenture Trustee also stresses that the resolution by the Horse Racing Board, dated March 24, 2006, denied Caribbean's request for a license. The Indenture Trustee cites from said resolution the following: "Certainly, if the Bankruptcy Court allows it, any party can acquire the assets and close the horse racetrack, provoking the death of our horse racing industry." Such a quote by the Indenture Trustee is an unnecessary intimation of jurisdictional tension. The court only repeats what it already stated in a footnote when issuing the injunction allowing the debtor to continue operating the horse track for a limited period of time. The court makes reference to the decision in Parque Ecuestre La Esmeralda, Inc., v. Junta Hípica de la Administración y el Deporte Hípico, 2004 WL 2810837 P.R., 2004 TSPR 178 (2004), wherein the Supreme Court of Puerto Rico reversed a decision by the Racing Board which denied the issuance of a license, and remanded the case for further proceedings. The concurring opinion in Parque Ecuestre states that the Racing Board was created to oversee the public safety, honesty, and integrity of the horse racing sport; and not to protect the economic welfare of any particular enterprise, which in the Parque Ecuestre La Esmeralda case was, ironically, El Comandante. In bankruptcy, economic solvency of the debtor is a key factor. Therein lies the apparent tension in this case, which this court has opted to overcome by issuing temporary injunctive relief until the licensing process terminates through a final decision. Licensing is a matter of state law; however, the bankruptcy court has jurisdiction over property of the estates. Bankruptcy law often creates inherent tension with pending parallel proceedings in other courts and administrative forums. The tension should not be unnecessarily heightened by the parties

[14]    See Opinion and Order entered on January 17, 2006, dkt. No. 744.

- 17 -

going to present to the court a suggested timetable and procedures, using the Altman Group as a balloting agent. As of this date the parties have not submitted a proposal. In view of the fact that there are now three competing plans, the court will issue a separate order to establish solicitation and balloting procedures which are effective and cost efficient for all parties..

### Conclusion

For the reasons stated above, Caribbean's Second Amended Disclosure Statement (Docket No. 1091), is hereby approved.

SO ORDERED.

In San Juan, Puerto Rico, this 29th day of May, 2006.

ENRIQUE S. LAMOUTTE
U.S. Bankruptcy Judge