IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>EL COMANDANTE MANAGEMENT COMPANY, LLC, et al.,<br><br>Debtors. | CASE NO. 04-10938 (ESL)<br><br>CHAPTER 11<br><br>(Jointly Administered) |

## OPINION AND ORDER

This case is before the court on the "Motion To Dismiss Debtors' Motion To Show Cause And To Set Aside Pending Discovery" ("Motion to Dismiss") filed by the Secretary of the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico, Jorge Silva-Puras ("Mr. Silva-Puras"), in his personal capacity, on May 2, 2006 (Docket No. 1111); debtors' Opposition (Docket No. 1142); debtors' "Addendum To Opposition To Motion To Dismiss Debtors' Motion To Show Cause And To Set Aside Pending Discovery" (Docket No. 1151); the "Opposition to 'Motion for Contempt for Violation 11 U.S.C. 362(A) (sic)" filed by Juan Vaquer Castrodad ("Mr. Vaquer"), Executive Director of the Land Administration of Puerto Rico, in his personal capacity, (Docket No. 1114); and debtors' "Reply to Opposition to Motion for Contempt for Violation 11 U.S.C. § 362 (a)" (Docket No. 1147). For the reasons set forth below, the motion to dismiss and the opposition to motion for contempt are denied.

## Jurisdiction

This court has jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, to entertain Messrs. Silva-Puras' and Vaquer's requests to dismiss the debtors' motion to show cause, as their actions and/or statements may be detrimental to the debtors' estates. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), and venue of debtors' jointly administered cases is proper in the District of Puerto Rico, pursuant to 28 U.S.C. § 1408(a), and the Order entered by the United States

Bankruptcy Court for the District of Delaware, on October 22, 2004, transferring venue to this District pursuant to 28 U.S.C. § 1412 (Docket No. 42).

### Factual and Procedural Background

El Comandante Management Company, LLC ("ECMC"), Housing Development Associates, S.E. ("HDA"), El Comandante Capital Corporation ("ECCC") (collectively the "debtors"), filed for bankruptcy under chapter 11 of the Bankruptcy Code on October 15, 2004. Mr. Silva-Puras is the Secretary of the Department of Economic Development and Commerce for the Commonwealth of Puerto Rico. The debtors allege that in September 2005, Mr. Silva-Puras made several statements to the media regarding the possible expropriation of the land where El Comandante's horse racetrack (the "racetrack") is located. These events moved the debtors to file an Urgent Motion For An Order To Show Cause on September 20, 2005 (Docket No. 430), against Messrs. Silva-Puras and Vaquer. A status conference was held on November 8, 2005, and the court ordered the parties to file simultaneous statements within fifteen (15) days, wherein the debtors shall describe with specificity the acts taken by Messrs. Silva-Puras and Vaquer that represent a violation of the automatic stay. Likewise, the court ordered Messrs. Silva-Puras and Vaquer to inform what actions, if any, has taken the government to commence an eminent domain proceeding against property of the debtors' estates. As to debtors' discovery request, the court ruled that the scope of the discovery would be determined upon the statements to be filed by the parties. *See* Minutes of November 8, 2005 (Docket No. 515).

On November 23, 2005, Messrs. Silva-Puras and Vaquer, appearing in their official capacity, filed a motion in compliance with this court's order of November 8, 2005, stating that the government of the Commonwealth of Puerto Rico (the "Government") has not issued a Declaration for Acquisition and Delivery nor has the government filed an eminent domain action regarding the premises where El Comandante racetrack is located (Docket No. 553). On January 24, 2006, debtors

informed the court that Messrs. Silva-Puras and Vaquer have been served with a Notice of Deposition (Docket No. 772). A motion to quash and for protective order was filed on January 31, 2006 by Messrs. Silva-Puras and Vaquer (Docket No. 812), on the grounds of the ripeness doctrine, as the government has not filed an eminent domain action; the government also requested the dismissal of debtors' motion for order to show cause for violation of stay, as the facts stated therein do not constitute a violation of stay; and, the notices of deposition served by debtors upon Messrs. Silva-Puras and Vaquer fail to comply with Fed.R.Civ.P. 26, 30 and 34. The court granted the motion to quash and ordered the parties to meet within thirty (30) days and to inform the court the dates agreed for the taking of the depositions and the production of documents, otherwise the court would set the dates (Docket No. 839). As of this date, the discovery is stalled as a result of several motions filed by Messrs. Silva-Puras and Vaquer requesting extension of time to proceed with the discovery (Docket entries No. 920, 942, 1008, 1009, 1015, 1016). The court did not rule on the merits of the request to dismiss the debtors' motion to find Mr. Silva Puras and Mr. Vaquer have violated the automatic stay.

On May 2, 2006, the debtors filed a motion for civil contempt for violation of section 362(a) of the Code against Messrs. Silva-Puras and Vaquer, for failure to comply with the discovery requests, and for trying to exercise control over property of the debtors' estates (Docket No. 1110). Debtors also seek damages and attorneys' fees. On that same date, Mr. Silva-Puras, appearing in his personal capacity, filed a motion to dismiss debtors' motion to show cause and to set aside pending discovery, on the grounds of qualified immunity, and lack of jurisdiction of the bankruptcy court under the ripeness doctrine, as an eminent domain action has not been filed by the government (Docket No. 1111). Debtors filed their opposition on May 16, 2006, and set forth some of the actions taken by Messrs. Silva-Puras and Vaquer in preparation for the commencement of the

- 3 -

eminent domain action against the debtors' property, particularly against the premises where the racetrack is located (Docket No. 1142). Debtors' allegations are supported with several letters from Messrs. Silva-Puras and Vaquer, including a letter from Mr. Vaquer to Mr. William Lockwood, President to the Government Development Bank of Puerto Rico, dated August 18, 2005, requesting a loan to compensate the owners of the racetrack when the eminent domain action is filed. The letters included in debtors' response expressly acknowledge that the owners of the land to be expropriated are under the protection of the bankruptcy court, and that the actions to expropriate are aimed at protecting the horse racing industry. See Docket No. 1151.

The eminent domain issue was raised by counsel representing Messrs. Silva-Puras and Vaquer in their official capacity at the hearing scheduled for April 25, 2006, when the Horse Racing Administrator objected to the approval of Caribbean Thoroughbred Racing Company, Inc.'s second amended disclosure statement, and disclosed to the court the "government's" intent to expropriate debtors' property, if the land where the racetrack is located is sold to an entity not qualified to operate the business and/or an entity that will use the land for purposes other than a racetrack. The alleged ground for the actions is that it must protect the horse racing industry in Puerto Rico. Counsel for the Horse Racing Administrator (and also counsel for Messrs. Silva Puras and Vaquer in their official capacity) also clarified that the government will request relief from the automatic stay prior to the commencement of an eminent domain action in the local courts. See Transcript of April 25, 2006, p. 106 (Docket No. 1127).

Other governmental actions

The horse racing industry in Puerto Rico is highly regulated through the Puerto Rico Racing Board (Racing Board) and the Horse Racing Administrator of the Puerto Rico Horse Racing Industry and Sports Administrator ( Racing Administrator). See the Puerto Rico Racing Industry and Sports

- 4 -

Act, as amended, and implementing Regulations. 15 L.P.R.A. §§ 198a et seq. The horse racing industry also generates significant tax revenues to the Puerto Rico Treasury Department. Thus, the government of Puerto Rico has a special interest in the outcome of this bankruptcy proceeding.

The Racing Administrator has actively participated in the instant bankruptcy proceedings, and the Racing Board has also intervened. Their participation centers on who will ultimately own and operate the racetrack. A summary follows.

On October 14, 2005, Camarero Race Track Corporation ("Camarero") and Wells Fargo Bank, National Association, in its capacity as Indenture Trustee ("Indenture Trustee") executed a commitment wherein Camarero offered to purchase substantially all of the debtors' assets for the amount of $60 million, subject to certain terms and conditions set forth in the "Term Sheet For Sale Of Substantially All Of The Assets Of El Comandante Management Company, LLC, Housing Development Associates, S.E., And El Comandante Capital Corporation Under A Plan Of Reorganization." See Creditor's Second Amended Disclosure Statement, Exhibit C (Docket No. 482). A letter from FirstBank to Camarero dated November 21, 2005, confirms the bank's financial commitment to facilitate the loan in the amount of $60 million to Camarero for the purchase of debtors' assets. See Creditor's Third Amended Disclosure Statement (Docket No. 555). On December 30, 2005, the Indenture Trustee held a public auction to sell substantially all of debtors' assets, using Camarero as the stalking horse in the auction. Camarero was designated the winning bidder, on January 5, 2006 (Docket No. 703). According to the Indenture Trustee, Camarero was designated the winning bidder, notwithstanding that its final bid of $64 million was lower than Caribbean's $67 million, mainly because Camarero has a license to operate the racetrack, as opposed to Caribbean who does not have a license, and it is unlikely that one will be issued in the near future, "if ever." See Informative Motion Of Wells Fargo Bank, National Association, In Its

Capacity As Indenture Trustee, Advising The Court Of The Results Of the Auction And In Response To This Court's Order Dated January 1, 2006 (Docket No. 703). Camarero's financial capability to purchase the debtors' assets upon confirmation of the Indenture Trustee's plan was confirmed in a letter from FirstBank to Camarero, dated February 15, 2006, wherein the bank increased Camarero's loan facilities to $64 million, subject to an additional investment of $10 million by Camarero's shareholders. *See* Minutes of February 23, 2006, Exhibit 1 (Docket No. 952), and Transcript of hearing held on February 23, 2006, p.p. 128-130 (Docket No. 957). FirstBank's financial commitment is based on a projected cash-flow of Camarero after purchasing the debtors' assets, provided that there are no material business interruptions. In sum, both the results of the auction and the financial commitment issued by FirstBank to Camarero, rest on the fact that a license to operate the racetrack has been issued to Camarero by the Racing Board. The license was issued by the Racing Board to Camarero based on the representation that Camarero would be able to purchase the debtors' assets, since at the time that the license was issued, Camarero did not have a racetrack.

Other entities have expressed interest in the racetrack operation. Puerto Rico Horses Race Track, Inc. ("PRHRT") filed its license application on March 1, 2005, prior to the bar date[1] of March 31, 2005 set by the Board on February 24, 2005. Codere of Puerto Rico, Inc. ("Codere"), and Intralot USA, Inc. ("Intralot") also filed timely license applications to operate the racetrack. However, Codere and Intralot withdrew their license applications.

Three entities filed their license applications after the March 31, 2005 bar date, to wit, Racing Management Corporation ("Racing Management"); Caribbean Thoroughbred Racing Company, Inc. ("Caribbean"), and debtors. All three applications have been denied by the Board. Racing

---

[1] The bar date of March 31, 2005, appears to have been set by the Racing Board under its discretionary regulatory authority. However, the importance and relevance of said date as being beneficial to the horse racing industry has not been presented nor shown to the court.

Management's application was denied by the Board on the grounds that the application was filed after the bar date, and the evidence submitted by the applicant failed to show that it had the corporate structure and financial capability to request the license. Caribbean's application was also denied as being late.

On December 23, 2005, the Puerto Rico Horse Racing Administrator (the "Racing Administrator") filed an urgent motion requesting the appointment of a chapter 11 trustee, on the grounds that the Board has rejected debtors' request to extend the temporary license due to expire on December 31, 2005, and debtors' gross negligence and mismanagement of debtors' operations (Docket No. 635). The government suggested that Mr. Wigberto Mender be appointed as interim trustee, as his appointment had already been approved by the Board, and a temporary license had been issued to Mr. Mender to operate the racetrack. On December 28, 2005, the Racing Administrator supplemented his request by including a copy of the Interlocutory Resolution Appointing Interim Trustee issued by the Board on December 27, 2005 (Docket No. 649). On December 28, 2005, debtors opposed the appointment of a trustee as being unnecessary, on the grounds that current management has improved the debtors' operations postpetition, making the business more profitable (Docket No. 661). A hearing was held on December 29, 2005 (Docket No. 669). The court denied the request for appointment of a trustee and concluded that the preponderance of the evidence presented, based on the totality of the circumstances, does not establish cause under section 1104(a)(1) of the Code, nor meets the best interest test under section 1104(a)(2). A written opinion and order followed on December 30, 2005 (Docket No. 673). On January 5, 2006, the government moved the court to alter or ament judgment and for reconsideration of order denying appointment of a trustee (Docket No. 707). The government's motion was denied, on January 17, 2006 (Docket No. 744).

On December 29, 2005, the debtors filed an adversary proceeding against the Racing Administrator and the Board, requesting the issuance of a temporary restraining order, a preliminary injunction and a permanent injunction, to continue the racetrack operation while the debtors exhaust all the appellate procedures, to avoid the closing of debtors' operations, which will be detrimental to all creditors and the horse racing industry in Puerto Rico, Adversary Proceeding No. 05-294. On December 30, 2005, the court issued a temporary restraining order for ten (10) days, effective on January 1, 2006 (Docket No. 3, Adv. No. 05-294), and ordered the defendants to show cause within ten (10) days why the preliminary injunction should not be issued against the Racing Administrator and the Board to maintain debtors' temporary license in order to continue operations until the appeal process of the denial of the license request is final, or a plan is confirmed. The court emphasized that the preliminary injunction was only a temporary measure to protect the going concern value of the property of the estates. After a review of the parties' pleadings, the court issued the preliminary injunction on January 10, 2006, until the appeal process of the denial of debtors' request to extend the temporary license is final, a plan is confirmed, or March 31, 2006, whatever is first, unless further extended by the court (Docket No. 10, Adv. No. 05-0294). On March 9, 2006, this adversary proceeding was reassigned to Judge J. Michael Deasy, who extended the preliminary injunction until June 30, 2006 (Docket No. 50, Adv. No. 05-0294). Debtors' motion requesting a second extension of preliminary injunction is pending before the court (Docket No. 61, Adv. No. 05-0294). A hearing has been scheduled for June 22, 2006 (Docket No. 63, Adv. No. 05-0294).

## **Applicable Law and Discussion**

The court assumes that Mr. Silva-Puras' motion to dismiss is filed under the provisions of Rule 12(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") made applicable in bankruptcy through Rule 7012(b) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."), and that

- 8 -

debtors' motion for contempt and the remedy requested is a contested matter pursuant to Fed.R.Bankr.P. 9014.  Although Fed.R.Bankr.P. 7012 is not expressly applicable to contested matters, the court in its discretion can, under Fed.R.Bankr.P. 9014, "by specific order in a particular matter," determine Fed.R.Bankr.P. 7012 applicable to a contested matter.  10 Lawrence P. King, *Collier on Bankruptcy* ¶ 7012.02, 15th Edition Revised (2006).  In view of the above, the court makes Fed.R.Bankr.P. 7012 applicable to the instant contested matter.

Generally, the court will take as true the well-pleaded facts of the complaint[2], when considering a motion to dismiss under Rule 12(b)(6). *Isla Nena Air Services, Inc., et al. v. Cessna Aircraft Company, et al.,* ____ F.3d ____, 2006 WL 1479805 (1st Cir. Puerto Rico, May 31, 2006). The court will review the "complaint, documents annexed to it or fairly incorporated into it, and matters susceptible to judicial notice." *Centro Médico del Turabo, Inc., et al. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005).  "Once the court has performed this tamisage, dismissal for failure to state a claim will be appropriate if the pleadings fail to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  Id. (citations omitted).  In *Arturet-Vélez v. R.J. Reynolds Tobacco Company, et al.*, 429 F.3d 10, 13 (1st Cir. 2005), the court held that "a complaint should not be dismissed if a claim can plausibly be embraced" by the allegations of the complaint, which the court will take as true for purposes of the motion to dismiss.

When considering the qualified immunity defense on a motion to dismiss, the court will determine "whether the facts alleged, viewed in the light most favorable to the complaining party, show that the officer's conduct violated some constitutional right." *Limone, et al. v. Condon*, 372 F.3d 39, 46 (1st Cir. 2004) (citations omitted). In *Pagán v. Calderón*, ____ F.3d ____, 2006 WL

---

[2]  The court construes references to a "complaint "as being to a "motion" in a contested matter.

- 9 -

1320744, *1 (1st Cir. Puerto Rico, May 16, 2006), the court applied the motion to dismiss standard followed in *Limone, supra,* and held that when the court is moved to dismiss an action under Rule 12(b)(6), based on qualified immunity, the court "must accept as true the factual averments of the plaintiffs' complaint."

In the instant case, the court will take as true the facts alleged in debtors' motions alleging violations to the automatic stay. In any event, they are not controverted by Mr. Silva-Puras in his motion to dismiss.

Violation of the Automatic Stay and the Contempt Power of the Court.

The Bankruptcy Code provides that the filing of a bankruptcy petition triggers the automatic stay, which is applicable to all entities of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Upon the filing of the petition, the trustee or debtor in possession "takes control of all property of the estate in order to maintain any going concern value and to assure equitable distribution of the property among creditors." 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 362.03[5] , 15th Edition Revised 2005. "This requires that no entity seek to interfere with these tasks by taking possession of or exercising control over property of the estate." Id. "The stay applies to attempts to obtain or exercise control over both tangible and intangible property." Id.

The automatic stay in 11 U.S.C. § 362(a)  is one of the basic protections under the Bankruptcy Code and becomes operative by the mere filing of a bankruptcy petition. *In re Soares,* 107 F.3d 969, 971 (1st Cir. 1997). The automatic stay is extremely broad in scope and "applies to almost any type of formal or informal action against the debtor or the property of the estate. The stay applies to all entities." [Footnotes omitted.] *Collier on Bankruptcy* ¶ 362.03. The automatic stay "in terms of a chapter 11 debtor, provides breathing space to permit the debtor to focus on its

rehabilitation or reorganization." Id. The self-executing provisions of the automatic stay intend to relieve the debtor of the "financial pressures and problems" which caused debtor to file the bankruptcy petition. Id. *Norton Bankruptcy Law and Practice 2d* § 36:4 (2005).

The injunctive restraint imposed by the automatic stay emanates from an act of Congress and not from the bankruptcy courts. Courts, federal and state, are bound by the provisions of the automatic stay as they are entities within the meaning of the Bankruptcy Code. *Norton Bankruptcy Law and Practice 2d*, § 36:5. In 1984, the Bankruptcy Code was amended to add the following phrase at the end of section 362(a)(3): "or to exercise control over property of the estate." The amendment further broadens the scope of the automatic stay as it clarifies that physical possession is not required. Id.

A debtor corporation may request that an entity be held in contempt of court for violation of the automatic stay under the contempt power of the court, pursuant to section 105(a) of the Bankruptcy Code.[3] *See Spookyworld, Inc. v. Town of Berlin, et al.*, 346 F.3d 1 (1st Cir. 2003); *In re Skinner*, 917 F.2d 444 (10th Cir. 1990). The extent and the parameters within which bankruptcy courts may exercise their contempt powers have been the subject of debate.[4] Since 1989 this court has opined that it has civil contempt power over matters under its jurisdiction and has broad powers under section 105 (a) to sanction and punish contempt for violations of the automatic stay provisions

---

[3] 11 U.S.C. § 105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provisions of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[4] Carlos J. Cuevas, *Imposing Sanctions: Judicial Code § 1927*, 17 Am. Bankr. Inst. J. 10, (1998); Kimberly A.Cary, *The Arsenal of Sanctioning Powers at the Bankruptcy Court's Disposal*, 13 Bankr. Dev. J. 443 (1997); Bartell, Laura B., *Contempt of the Bankruptcy Court-A New Look*, 1996 U. Ill. L. Rev. 1 (1996); Joan Burleson, *Contempt Proceedings in Bankruptcy Court*, 22 Colo. Law. 515 (1993).

of 11 U.S.C.§ 362(a). In *In re Cordova Gonzalez*, 99 B.R. 188, 191 (Bankr. D. P. R. 1989).

The United States Court of Appeals for the First Circuit has upheld the power and authority of bankruptcy courts to issue contempt orders under Rule 9020(b) of the Federal Rules of Bankruptcy Procedure, pursuant to its inherent powers as a court, and under the limited equity powers bestowed by Section 105(a) of the Bankruptcy Code, 11 U.S.C. §105(a). In *In re Power Recovery Systems, Inc.*, 950 F.2d 798, 802 (1st Cir. 1991), the First Circuit upheld the power of a bankruptcy court to issue a civil contempt order provided proper notice is given under Rule 9020(b) of the Federal Rules of Bankruptcy Procedure. Recently, in *Bessette v. AVCO Financial Services, Inc.*, 230 F.3d 439, 444-445 (1st Cir. 2000), the First Circuit found that a bankruptcy court may exercise its equity powers under section 105 to enforce a specific code provision, either under the statutory powers or pursuant to its inherent[5] contempt powers. Specifically, the court ruled that:

> [A] court is well within its authority if it exercises its equitable powers to enforce a specific code provision. Thus, § 105 does not itself create a private cause of action, but a court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code,' *Noonan*, 124 F. 3d at 28, so long as the court acts consistent with the Code and does not alter the Code's distribution of other substantive rights, see id.; *SPM Mfg.*, 984 F.2d at 1311.

and,

> [Section 105] provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have. Those contempt powers inherently include the ability to sanction a party. [Citations omitted.]

*Id.*

The limits placed by the First Circuit in *Bessette* comport with the strictures set forth by Nickles and Epstein in their article, *Another Way of Thinking About Section 105(a) and Other*

---

[5] This court adopts the definition of 'inherent authority' by Professor Daniel J. Meador in *Inherent Judicial Authority in the Conduct of Civil Litigation*, Texas Law Review, June 1995; that is, 'inherent authority' "means the authority of a trial court, whether state or federal, to control and direct the conduct of civil litigation without any express authorization in a constitution, statute, or written rule of court. This authority, in other words, flows from the powers possessed by a court simply because it is a court; it is an authority that inheres in the very nature of a judicial body and requires no grant of power other than that which creates the court and gives it jurisdiction." 73 Tex. L. Rev. 1805.

*Sources of Supplemental Law under the Bankruptcy Code*, 3 Chap. L. Rev. 7 ( 2000). The courts may not use section 105 (a) to create supplemental law and may only utilize the equity powers to preserve the very rights embodied in the substantive provisions of the Code because "[u]ltimately, equity lies not in the court, but in the Bankruptcy Code it applies." Marcia S. Krieger, *The Bankruptcy Court Is a Court of Equity: What Does That Mean?*, 50 S. C. L. Rev. 275, 311 (1999).

The pleadings in this contested matter and the record show that the government has made expressions through Messrs. Silva Puras and Vaquer regarding the possibility of expropriating debtors' real estate. Respondents allege that they have not initiated an expropriation action, but are only considering it. However, "[a] good faith belief in a right to the property is not relevant to a determination of whether the violation was willful." *Fleet Mortgage Group, Inc. (In re Kaneb)*, 196 F.3d 265, 268 - 269 (1st Cir. 1999) The respondents actually knew of the filing of the petition, and should know that the racetrack is property of the estate.

Therefore, the court finds that it has authority to consider and adjudicate debtors' motion against respondents for the alleged violations of the automatic stay. Whether or not the actions taken are a violation of the automatic stay will depend on the facts presented to this court.

Eminent Domain.

The Racing Board is the government entity that has the power to issue a license to operate a racetrack in Puerto Rico. 15 L.P.R.A. §§ 198e, 198o. This court, however, has exclusive jurisdiction over property of the estate, and may issue any order that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. 28 U.S.C. § 1334(e), and 11 U.S.C. § 105(a). Based on these premises, the court will review the issue of eminent domain as a proposition to exercise control of property of the estate.

The policy of the Bankruptcy Code is to allow regulatory and police actions to proceed in

spite of the automatic stay provisions of 11 U.S.C. § 362(a). The police power belongs to the states. *The Slaughter-House Cases*, 83 U.S. 36 (1872); *Barbier v. Connolly*, 113 U.S. 27 (1884). However, a governmental unit may not pursue actions over property of the estate without first obtaining relief from the stay. *Collier on Bankruptcy* ¶ 362.05[5][a]. The U.S. Constitution grants Congress the power to regulate bankruptcy, and authorizes a bankruptcy court to protect its jurisdiction when governmental units interfere with property of the estate. *Ex Parte Baldwin*, 291 U.S. 610 (1934); *Kalb v. Feuerstein*, 308 U.S. 433 (1940). The broad jurisdiction of the bankruptcy courts over property of the estate can be found in 11 U.S.C. § 362(a). In *Central Virginia Community College, et al. v. Katz*, ____ U.S. ____, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006), the Supreme Court held that "Bankruptcy jurisdiction, at its core, is *in rem*." 126 S.Ct. at 995. "As such, its exercise does not, in the usual case, interfere with state sovereignty even when States' interests are affected." 126 S.Ct. at 1000. When a State elects to participate or intervene in a bankruptcy proceeding, the State is bound by the bankruptcy court orders "no less than other creditors." 126 S.Ct. at 996.

There are two tests which are commonly used to determine if the governmental action is one exercising the state's police or regulatory power: the pecuniary policy test and the public policy test. *Collier on Bankruptcy* ¶ 362.05[5][a]. Under the pecuniary test the court must determine if the governmental unit is pursuing a matter of public safety and welfare or a pecuniary interest. Under the public policy test the court must determine if it is a matter of public policy or if the governmental unit is adjudicating private rights. Only if the government is pursuing a matter of public safety and welfare or if it is a matter of public policy will the action come under the police and regulatory exception.

The police and regulatory powers of the state refer to the enforcement of laws or regulations that affect the health, welfare, morals, and safety, but not to administrative laws that directly conflict

- 14 -

with the bankruptcy court's control over the property of the estate. *In re Beker Industries Corp.,* 57 B.R. 611 (Bankr. S.D.N.Y. 1986); *Hillis Motors, Inc. v. Hawaii Auto Dealers' Ass'n,* 997 F.2d 581 (9th Cir. 1993).

The sovereign's eminent domain power is different than its police or regulatory power. The U.S. Constitution defines the confines of governmental power and its application. The power of eminent domain is inherent to the sovereign. The states have such power. *City of Cincinnati v. Louisville & N.R. Co.,* 223 U..S. 390 (1912); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229 (1984). However, actions to acquire property by eminent domain are not excepted from the automatic stay under the police and regulatory power exception. *In re PMI-DVW Real Estate Holdings, L.L.P.,* 240 B.R. 24 (Bankr. D. Ariz. 1999). Eminent domain may be used to implement the state's police power. *In re Altamirco,* 56 B.R. 199 (Bankr. C.D. Cal. 1986). In order for the eminent domain action to come within the police and regulatory exception it must be done in furtherance of the stated purpose of public health, safety or welfare. *In re Burgos,* 294 B.R. 210 (Bankr. D. Conn. 2003); *Matter of Catalano,* 155 B.R. 219 (Bankr. D. Neb. 1993).

The Supreme Court of Puerto Rico in *The Richards Group v. Junta de Planificacion,* 108 D.P.R. 23, 26 (1978), recognized the confusion regarding the differences between the police power and eminent domain power of the states. The court lists twelve factors to consider in reaching a conclusion, admitting that the same is fact intensive and must be done on a case by case basis. It defines the task as one trying to find a reasonable accommodation between the police power and eminent domain. 108 D.P.R. at 43.

In a recent decision, *Kelo v. City of New London,* 125 S.Ct. 2655 (June 23, 2005), the Supreme Court broadened the limits of what constitutes public purpose to justify the exercise of eminent domain action. The court held that the city's exercise of eminent domain power in

- 15 -

furtherance of an economic development plan satisfied the constitutional "public use" requirement. The 5-4 decision has generated controversy and criticism. *See* Steven J. Eagle, *Kelo v. City of New London: A Tale of Pragmatism Betrayed*, Section of State and Local Government Law, American Bar Association. The majority opinion of the court delivered by Justice Stevens acknowledges that the decision is based on the particular facts of the case, and stated that a "one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case. While such an unusual exercise of government power would certainly raise a suspicion that a private purpose was afoot, ..." 125 S.Ct. at 2667. The sovereign may not use its eminent domain power to take property from one private party for the sole purpose of transferring it to another private party, unless the purpose of the taking is future use by public.

Whether expropriating El Comandante racetrack to protect the racing industry from a specific owner and operator to allegedly insure future tax revenues from such an industry fits the public purpose interpretation in *Kelo* must be determined after the evidence is presented. Particularly, when *Kelo* was premised on a carefully considered development plan for the City of New London and a longstanding deference to legislative judgments in the eminent domain field.

In an excellent analysis of the eminent domain law of Puerto Rico, attorney Cynthia Torres Torres, *La Expropiación Forzoza en Puerto Rico, Ley Jurisprudencia y Guía Práctica (2002) (La Expropiación Forzoza)*, the author states that the constitutional provision regarding eminent domain is a limitation to the sovereign power of the state to expropriate to protect individuals from abuse and arbitrary decisions. Id. at p. 4. The Puerto Rico constitutional provision (Article II, Sec. 9) follows the federal constitution and states that private property for public use shall not be taken except upon just compensation and according to applicable law. Puerto Rico law implements the constitutional provision through its eminent domain law (32 L.P.R.A. §§ 2901 et seq.), the Civil

- 16 -

Code (Article 282), 31 L.P.R.A. § 1113,  and the Political Code (Article 8), 1 L.P.R.A. § 5.  The Constitution of Puerto Rico imposes the condition that the eminent domain action not only be for public use, but must also be necessary and useful to the public. *La Expropiación Forzoza* at p.5.

The Puerto Rico eminent domain law requires that there be a declaration of public benefit before the eminent domain action is initiated by the government. *La Expropiación Forzoza en Puerto Rico,* at p. 20.  The declaration of public benefit is a statutory requirement as it is not specifically included in the Puerto Rico constitution.  However, it is imbued with constitutional rank as shown by the intent of the drafters of the Puerto Rico constitution. Id. at  p.p. 22-23. The declaration of public benefit is a primary requirement for the eminent domain action to proceed.  It defines the public policy of the government with respect to a particular property. 32 L.P.R.A. § 2902.  However, it is the declaration for acquisition and delivery that carries the intention of obtaining possession and title over a specific property. Id. at p.p. 26-27.

In the case before this court, there are public expressions and statements in official correspondence that the government is considering eminent domain action to expropriate part or all of the land where El Comandante racetrack operates.  There is no evidence that the process has been initiated by seeking a declaration of public interest.

In the instant case, the government moves to dismiss debtors' motion for contempt, on the grounds that an eminent domain action has not been filed, and the acts and/or statements made by Mr. Silva-Puras "are not acts to obtain possession" or to exercise control over property of the estate. Mr. Silva-Puras argues that section 362(a)(3) of the Code does not prohibit the government from "contemplating" the idea of taking the racetrack. We disagree. The issue is fact intensive and hinges on the actual parameters encompassing the "contemplation" of the eminent domain action, the underlying reasons for any actions, and the legal basis upon which the actions were taken. Acts or

statements directed to the government's taking of debtors' property by an eminent domain action, may, under certain circumstances, constitute a violation of the automatic stay, as the consequences may be detrimental to debtors' reorganization and to the value of the estates. The documents in support of debtors' allegations show that the government, through its officers (Silva-Puras and Vaquer) was not just "contemplating" the idea of taking debtors' property, but it has taken affirmative steps to pursue an eminent domain action while the automatic stay is in effect. Whether the actions taken are a valid exercise of the government's police power through an eminent domain action or a violation of the automatic stay must be decided in light of the particular facts and circumstances of this case. At this stage, the court is constrained to accept as true the allegations in the debtors' motions and to draw all reasonable inferences in their favor.

Qualified Immunity.

"Qualified immunity is a judge-made doctrine created to limit the exposure of public officials to damage actions, thereby fostering the effective performance of discretionary functions in the public sector." *Pagán, et al. v. Calderón,* ____ F.3d ____, 2006 WL 1320744, *8 (1st Cir. Puerto Rico, May 16, 2006) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812 (1982). "The reach of this doctrine is long, but not infinite. It protects all but 'the plainly incompetent [and] those who knowingly violate the law.'" *Calderón,* 2006 WL 1320744, *8 (citing from *Malley v. Briggs,* 475 U.S. 335, 341 (1986). "As that exclusion has been interpreted, the doctrine does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." *Calderón,* 2006 WL 1320744, *8 (citations omitted).

Our circuit follows a three-step test to determine whether a state officer is entitled to qualified immunity. The court must examine (a) "whether the plaintiff's allegations, if true, establish a constitutional violation;" (b) "whether the constitutional right at issue was clearly established at the

- 18 -

time of the putative violation;" and, (c) "whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." *Calderón*, 2006 WL 1320744, *8. However, certain procedural requirements must be met prior to consider the applicability of the qualified immunity doctrine. When the defendant seeks the dismissal of the complaint, the court will review (a) whether "basic notice pleading requirements" under the federal civil rules have been met, and (b) "whether the facts set forth in the complaint, taken in the light most congenial to the complaining party, adequately allege that the defendant violated a federally-secured right." *Calderón*, 2006 WL 1320744, *8. The minimal facts that the court will look in the complaint are "who did what to whom, when, where, and why." *Calderón*, 2006 WL 1320744, *9 (citation omitted).

In the instant case, the record shows that debtors' "Urgent Motion For An Order To Show Cause" (Docket No. 430); debtors' "Motion For Contempt For Violation 11 U.S.C. § 362(a)" (Docket No. 1110); debtors' "Opposition To Motion To Dismiss Debtors' Motion To Show Cause And To Set Aside Pending Discovery" (Docket No. 1142); and, debtors' "Addendum To Opposition To Motion To Dismiss Debtors' Motion To Show Cause And To Set Aside Pending Discovery" (Docket No. 1151), were properly notified to both Messrs. Silva-Puras and Vaquer, and their counsel in both their official and personal capacity.[6] Thus, the court finds that debtors' notices of the pleadings to Messrs. Silva-Puras and Vaquer comply with the procedural requirements of the Federal Rules of Civil Procedure made applicable in bankruptcy by the Federal Rules of Bankruptcy

---

[6] The certificate of service of debtors' urgent motion states that the motion was served personally on Messrs. Silva-Puras and Vaquer, as well as to counsel from the Puerto Rico Department of Justice (Docket No. 430). The certificates of service of debtors' motion for contempt; debtors' opposition to motion to dismiss, and debtors' addendum state that the pleadings were served to Carmen Conde, counsel for the government and Messrs. Silva-Puras and Vaquer; Hugo Rodríguez Díaz, counsel of Mr. Silva-Puras, in his personal capacity, Hon. Roberto Sánchez Ramos, Puerto Rico Secretary of Justice, and to counsel from the Puerto Rico Department of Justice (Docket entries No. 1110, 1142, 1151).

Procedure.  Accordingly, respondents have been afforded ample and reasonable due process to challenge the  allegations against them.

For discussion purposes of the motion to dismiss filed by Mr. Silva-Puras, we will consider debtors' urgent motion for an order to show cause, and debtors' motion for contempt simultaneously ("motion for contempt"), as both motions seek the same remedy, that Mr. Silva-Puras be found in contempt for violation of the automatic stay, 11 U.S.C. § 362(a)(3), and the request for the imposition of sanctions, damages and attorneys' fees.

Mr. Silva-Puras argues that, in any event, he is not personally liable of wrongdoing under the qualified immunity doctrine.  The applicability of the qualified immunity doctrine is determined based on whether the factors under the following test are met:

(a) "Whether plaintiff's allegations, if true, establish a constitutional violation."  The court finds that Mr. Silva-Puras' actions attempt against the debtors' property interest which is also property of the estate, and affects debtors' reorganization.  Debtors' property interest is constitutionally protected under U.S. Const. amends. V, XIV.  Debtors also have a constitutionally protected right to file for bankruptcy, as "Congress shall have the power to establish uniform laws on the subject of bankruptcies throughout the United States." U.S. Const. art. 1, § 8, cl. 4.  Debtors' property interest is equally protected under the Constitution of the Commonwealth of Puerto Rico, under Article II, § 9.

(b) "Whether the constitutional right at issue was clearly established at the time the putative violation."  Debtor's right to file for bankruptcy was enacted by Congress over two hundred years ago, in 1776.  Taking of private property without just compensation and due process of law were enacted by Congress by the Fifth Amendment in 1791 and the Fourteenth Amendment in1868.  Thus, these constitutional rights were clearly established at the time of the facts alleged in the complaint.

- 20 -

(c) Whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." The court finds that Mr. Silva-Puras either knew or should have known that his acts and statements would adversely affect debtors' reorganization, and would have a negative impact on the value of debtors' estates. There are no allegations in the motion to dismiss that will move this court to find otherwise at this stage of the proceedings, when debtors' allegations must be taken as true and all reasonable inferences drawn in their favor. The court finds that the qualified immunity doctrine is inapplicable to Mr. Silva-Puras.

## Conclusion

For the reasons stated above, the motion to dismiss filed by Mr. Silva-Puras (Docket No. 1111), and the opposition to motion for contempt filed by Mr. Vaquer (Docket No. 1114), in their personal capacity, are hereby denied. Respondents shall comply forthwith with any pending discovery. A pretrial hearing is hereby scheduled for June 27, 2006 at 2:30 p.m.

SO ORDERED.

In San Juan, Puerto Rico, this _8th_ day of June, 2006.

ENRIQUE S. LAMOUTTE
U.S. Bankruptcy Judge

- 21 -