IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>EL COMANDANTE MANAGEMENT COMPANY, LLC, et al.,<br><br>Debtors. | CASE NO. 04-10938 (ESL)<br><br>CHAPTER 11<br><br>(Jointly Administered) |

### OPINION AND ORDER

This case came before the court on November 16, 17 and 20, 2006, for a hearing to consider the confirmation of the Second Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession El Comandante Management Company, LLC ("ECMC"), Housing Development Associates, S.E. ("HDA"), and El Comandante Capital Corp. ("ECCC") dated August 4, 2006, filed by Caribbean Thoroughbred Racing Company, Inc., ("the Caribbean's Plan") (Docket No. 1431) and subsequently modified on November 15, 2006 (Docket No. 2095). On December 5, 2006 the court granted ECCC's motion for voluntary conversion to Chapter 7 of the Bankruptcy Code, therefore, Caribbean's Plan shall be considered as a joint plan only as to debtors HDA and ECMC. (Docket No. 2172). The court hereby allows Caribbean's non-material modifications of its Second Amended Joint Plan filed on November 15, 2006 as being for the benefit of creditors. (Docket No. 2095).

The following objections to the confirmation of Caribbean's Plan were filed and heard: Opposition of Wells Fargo Bank, NA in its capacity as Indenture Trustee, (1) to Caribbean Thoroughbred Racing Company, Inc.'s Restated Second Amended Joint Plan of Reorganization for Debtors and (2) to Caribbean's Statement Regarding Requirements of Section 1129(a) (the "Indenture Trustee's Opposition") (Docket No. 1954), Treasury Department's Objection To Confirmation Of Caribbean Thoroughbred Racing Company, Inc.'s Restated Second Amended

Joint Plan of Reorganization (Docket No. 1947); Motion of Camarero Race Track Corp. to Join in and Support the Objections of the Indenture Trustee to (I) Debtors' Plan and (II) Caribbean's Plan; and, the Horse Racing Administrator's position (Dkt. No. 1942). On November 20, 2006 Puerto Rico Horses Race Track, Inc. withdrew its objection to the confirmation of Caribbean's Plan filed on October 20, 2006, Docket No. 1944. (Docket No. 2109).

## Jurisdiction

This court has jurisdiction to entertain Caribbean's request to confirm its proposed plan, pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L), and venue of debtors' jointly administered cases is proper in the District of Puerto Rico, pursuant to 28 U.S.C. § 1408(a), and the Order entered by the United States Bankruptcy Court for the District of Delaware, on October 22, 2004, wherein venue was transferred to this District, pursuant to 28 U.S.C. § 1412. (Docket No. 42).

## Factual and Procedural Background

On October 15, 2004, El Comandante Management Company, LLC ("ECMC"), Housing Development Associates, SE ("HDA"), and El Comandante Capital Corp. ("ECCC") (collectively the "debtors"), filed three separate petitions under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware. On October 20, 2004, debtors moved the court to allow the joint administration and procedural consolidation of the three separate petitions (Docket No. 8). Debtors' request for a joint administration and procedural consolidation was granted by the court on October 22, 2004. (Docket No. 36). Upon the request of the Treasury Department of the Commonwealth of Puerto Rico, and the Horse Racing Administrator of the Puerto Rico Horse Racing Industry and Sport Administration, on October 22, 2004 the Delaware Bankruptcy Court granted the transfer of venue to the United

States Bankruptcy Court for the District of Puerto Rico. (Docket No. 42).

On August 4, 2006, the court entered a Joint Solicitation Procedures Order for all three plans filed in this case, that is, the secured creditor (Indenture Trustee) plan, the debtors' plan and Caribbean's Plan. On December 5, 2006, the court granted ECCC's motion to convert to chapter 7.

The court will address in this order the contested issues as they were presented in the motions and hearings concerning the August 4, 2006 plan, as modified.

### Caribbean's Plan

Caribbean is a domestic corporation organized and authorized to do business under the laws of the Commonwealth of Puerto Rico on September 1, 2005. Its current shareholders and directors are: Charles A. Cuprill Hernandez, Pedro A. Feliciano Benitez, Luis A. Rivera Siaca, J. Adalberto Roig Ferre, The Casper Callen Trust, with a combined share of 63.79314%, and Puerto Rico Horses Race Track, Inc. with a share of 36.20685%. Caribbean was formed for the purpose of purchasing debtors's assets, operate the racetrack and assume its control and operation if finally granted a license by the Racing Board. Caribbean's Plan is premised on the sale of debtors' assets upon confirmation of the proposed plan, pursuant to the terms of the Asset Purchase Agreement. A license to operate El Comandante Racetrack is not a condition or requirement for Caribbean to purchase debtors' assets. The purchase price for the acquisition of debtors' assets by Caribbean, has been increased to $83,375,000.00, which will be derived from a $75,750,000.00 loan by Westernbank, and capital contributions to be provided by Caribbean's shareholders in the amount of $14.5 million.[1] Debtors' assets to be sold include the racetrack, the real property, equipment,

---

[1] On November 17, 2006, during the hearing on confirmation of Caribbean's Plan, Mr. Charles A. Cuprill Hernandez testified that Caribbean's shareholders would make a capital call in the event of a shortfall if all contingency claims are allowed, in order to pay all creditors in full in

books and records, intellectual property, supplies, permits (to the extent such are transferable and assignable), and goodwill. Caribbean's Plan provides for payment in full to all creditors.

In support of the confirmation of their Plan Caribbean presented the following testimony: Mr. Charles A. Cuprill, president of Caribbean, CPA Jose A. Monge Robertin, Mr. Stanley Pinkerton, Vice President and Chief Financial Officer of ECMC and Mr. Gabriel Montanez, Vice President of Westernbank's Business Credit Division. On rebuttal the Indenture Trustee presented the expert testimony of Mr. Jeffrey Sutton from Mahoney, Cohen & Co., Liquidation Analysts.

### Applicable Law and Discussion

Section 1128(a) of the Bankruptcy Code requires that an actual hearing on confirmation of a plan be held. Section 1128(b) of the Code provides that any party in interest may object to the confirmation of a plan. Section 1109(b) of the Code provides a nonexclusive definition of party in interest.[2] A party may object to the treatment of its claim under a proposed plan, regardless of whether the claim is impaired or unimpaired. "An impaired creditor, for example, always has standing to object to its treatment under the best interest of creditors' test. Even if the plan declares a certain creditor to be unimpaired, that creditor should have standing to contest that categorization." *Collier on Bankruptcy*, ¶ 1129.02[3].

In the instant case, the confirmation hearing on Caribbean's Plan was held on November 16,

accordance with Caribbean's Plan. No other evidence was presented supporting Mr. Cuprill's statements. No written document or testimony of the other shareholders was submitted. In fact, Mr. Cuprill testified that the agreement among the shareholders to contribute additional funds if necessary was not reduced to writing. This court finds that Mr. Cuprill's testimony alone, in this regard, is not sufficient to establish that in fact additional funds will be provided by Caribbean's shareholders if need be.

[2] 11 U.S.C. § 1109(b) provides that: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

- 4 -

17 and 20, 2006, after due notice to all creditors and parties in interest. The objections to confirmation of Caribbean's Plan were also heard on the same dates.

Section 1129 of the Bankruptcy Code governs the requirements for confirmation of a proposed chapter 11 plan. Section 1129(a) specifically provides that a plan shall be confirmed only if all the requirements are met. The proponent of a plan has the burden of showing that the plan complies with all the requirements of section 1129(a) of the Code. If all classes do not accept the plan, then, it is a non consensual plan, and the proponent must show that the plan meets the requirements of section 1129(a), other than section 1129(a)(8), and section 1129(b). "In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence." 7 Lawrence P. King, *Collier on Bankruptcy*, ¶ 1129.02[4], 15th Revised Edition 2005.

The members of the impaired Classes 2 and 5 in HDA, and Classes 2 and 5 in ECMC of Caribbean's Plan, rejected the same, thus, if all requirements of 1129(a), except for 1129(a)(8), are met, the requirements of the cram down provisions of Section 1129(b) become applicable as to the rejecting classes. (See, Voting Tabulation, Docket No. 1865 Exhibits C-1, C-2).

### Requirements of 11 U.S.C. § 1129(a)

1. Section 1129(a)(1) requires that the plan complies with all applicable provisions of the Bankruptcy Code. The Indenture Trustee allege that the plan fails to meet the requirements of 1129(a)(1) because it fails to comply with section 1122 by the improper separate classification of the bondholders' deficiency claim from the other general unsecured creditors. It should be noted that even though the bondholders are classified separately from the other unsecured creditors, all unsecured creditors will receive the same treatment; they will be paid in full. See, Informative Motion filed by Caribbean on August 15, 2006 (Docket No. 1497), Indenture Trustee's Objection to Informative Motion filed on August 15, 2006 (Docket No. 1501), Caribbean's Reply filed on

August 15, 2006 (Docket No. 1503) and Order entered on August 16, 2006. (Docket No. 1511).

The improper classification of the bondholders' deficiency claim was also raised by the Indenture Trustee as an objection to the disclosure statement, on April 6, 2006 (Docket No. 1047) and April 21, 2006. (Docket No. 1084). Caribbean filed a response to the objection on April 22, 2006. (Docket No. 1090). In the Opinion and Order entered on May 30, 2006, approving the disclosure statement submitted by Caribbean, this court expressed that the classification may be permissible upon the particular circumstances of this case and that the Indenture Trustee is not foreclosed from renewing its objection as one to the confirmation of the plan.

In its response to the Indenture Trustee's objection, after acknowledging that the separate classification of the Indenture Trustee's claim is for the purpose of facilitating reorganization and not for abusive or manipulative purposes, Caribbean cited in part the case of In re Gato Realty Trust Corp., 183 B.R. 15, 23 (Bankr. D. Mass. 1995), as follows:

> This Court is unable to find an "unlawful purpose" in the act of separately classifying a claim holding rights greatly in excess of other unsecured creditors. Nor does this court find such a classification to be an improper manipulation. A far better example of manipulation can be found in the failure of a deficiency claim holder to exercise a § 1111(b) election, not because it desires the same treatment afforded unsecured creditors, but because it is certain that the combination of its deficiency claim with the claims of other unsecured creditors will be the death knell of the plan. The obvious drafting goal of every Chapter 11 debtor is to gain approval of a plan. A debtor's attempt to satisfy a requirement of confirmation, that is § 1129(a)(10), by separately classifying claims with decidedly different rights should not be the target of criticism.

The motivation for Caribbean to separately classify the bondholders' deficiency claim was to obtain a confirmable plan as it knew that the Indenture Trustee had clearly manifested its opposition to confirmation.

The statutory provision governing the classification of claims or interests is set forth in section 1122:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 USC § 1122.

The debtor may classify similar claims or interests in a particular class only if they are substantially similar to the claims and interests of such class. 11 USC § 1122(a). The plan may also designate an administrative convenience class consisting only of every unsecured claim that is less than or reduced to an amount, for example claims of $1,000.00 or less, that the court approves as reasonable and necessary. 11 USC §1122(b). But aside from this separate classification of unsecured claims specifically allowed by the Bankruptcy Code, the general rule in our circuit is that "all creditors of equal rank with claims against the same property should be placed in the same class." Granada Wines, Inc. v. New England Teamsters and Trucking Industry (In re Granada Wines, Inc.), 748 F.2d 42, 46 (1st Cir, 1984)(citations omitted), In re Greystone III Joint Venture, 995 F.2d 1274, 1278 (5th Cir. 1991) ("One cannot conclude categorically that § 1122(a) prohibits the formation of different classes from similar types of claims. But if § 1122(a) is wholly permissive regarding the creation of such classes, there would be no need for § 1122(b) specifically to authorize a class of smaller unsecured claims, a common feature of plans in reorganization cases past and present. The broad interpretation of § 1122(a) ... would render § 1122(b) superfluous, a result that is anathema to elementary principles of statutory construction."). The Granada Wines court further provided that "separate classification for

unsecured creditors are only justified where the legal character of their claims is such as to accord them a status different from the other unsecured creditors ...". Id. The Granada Wines court rejected the separate classification of an unsecured claim for "withdrawal liability" under the Multiemployer Pension Plan Amendments Act of 1980 holding that the difference between the withdrawal liability claim and the other unsecured claims affected only the allowable amount of the claim and not its legal nature. Granada Wines, 748 F.2d at 47. The question here is, whether the legal nature of a deficiency claim, such as the bondholders' in this case, accords them a different status from the other unsecured claims, and more precisely, whether the bondholders' unsecured deficiency claim is "legally different" from that of other unsecured claims because it arises statutorily pursuant to 11 USC § 1111(b), when an undersecured creditor has the option to elect to have its claim treated as fully secured.

The bankruptcy courts within the First Circuit have adopted different positions on this matter, while acknowledging that Granada Wines is the controlling authority on claim classification in this circuit. In the case relied on by Caribbean, Gato Realty, the court began its discussion by stating that the majority of courts, including the courts in that district, have denied confirmation of plans that separately classify deficiency claims from other general unsecured claims. Gato Realty, 183 B.R. at 20 citing Boston Post Road, Ltd. Partnership, 21 F.3d 477 (2d Cir. 1994); John Hancock Mut. Life Ins. Co. v. Rt. 37 Bus. Park Assocs., 987 F.2d 154 (3rd Cir.1993); In re Lumber Exch. Bldg. Ltd. Partnership, 968 F.2d 647 (8th Cir.1992); In re Bryson Properties XVIII, 961 F.2d 496 (4th Cir.1992), cert. denied, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); In re Greystone III Joint Venture, 948 F.2d 134 (5th Cir.1991), as amended following reh'g en banc, 995 F.2d 1274 (5th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); In re Barney & Carey Co., 170 B.R. 17 (Bankr. D. Mass. 1994); In re

- 8 -

Cranberry Hill Associates Ltd. Partnership, 150 B.R. 289 (Bankr. D. Mass. 1993); In re Cantonwood Associates Ltd. Partnership, 138 B.R. 648 (Bankr. D. Mass. 1992); In re L.G. Salem Ltd. Partnership, 140 B.R. 932 (Bankr. D. Mass. 1992); *Collier on Bankruptcy* ¶ 1122.03[6][c] p. 1122-30. The Gato Realty court explains that the reasoning of the majority approach rejects the notion that § 1111(b) makes a deficiency claim different from other general unsecured claims, and rejects separate classification of unsecured claims solely to create an impaired assenting class. Gato Realty, 183 B.R. at 20 citing Boston Post Road, Ltd. Partnership, 21 F.3d 477. However, the Gato Realty court determined that a "deficiency claim subject to §1111(b) enjoys the right to assume a different rank, status and character than other unsecured creditors against property of the estate" and therefore can be separately classified from other unsecured creditors. Gato Realty, 183 B.R. at 21. Judge Boroff's reasoning is that the deficiency claimants will always vote in the interest of the secured claim, so on the principles of basic voting democracy it does not make sense to have a claimant with that different motivation to be in the same class as the other claimants. Gato Realty, 183 B.R. at 22; See also, Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership, 248 B.R. 668, 691 (D. Mass., 2000).

In the often cited case of Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274 (5th Cir. 1991), followed by the majority bankruptcy courts in our circuit, the court entertained a situation very similar to the one before us. In that case, the holder of a nonrecourse mortgage was undersecured, and pursuant to 11 USC § 1111(b) the nonrecourse mortgage was automatically converted to recourse giving the mortgagee two claims; one secured and the other unsecured. Anticipating that the mortgagee would not vote in favor of the plan because of its opposition to the reorganization, the debtor hoped to confirm its plan of reorganization by separately classifying the deficiency claim, comply with the

- 9 -

requirement of 11 USC § 1129(a)(10) by getting the acceptance of the unsecured class (an impaired class), and requesting the confirmation pursuant to the cram down provisions of 1129(b). On the petition date, the debtor, Greystone, owed the mortgagee approximately $9,325,000, trade creditors approximately $10,000, and taxing authorities approximately $145,000. The mortgagee's secured claim was valued at $5,825,000, the appraised value of the office building serving as collateral, leaving the mortgagee an unsecured deficiency of approximately $3,500,000. In Greystone the Fifth Circuit Court of Appeals cited the one clear rule that emerges from the case law on § 1122 claims classification: "thou shall not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." Greystone III, 995 F.2d at 1279. Citing to the Sixth Circuit, the Greystone court observed "[t]here must be some limit on a debtor's power to classify creditors in such a manner ... Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class." Id. In rejecting the argument that the § 1111(b) election makes the deficiency claim legally different, the court expressed the following:

> The purpose of § 1111(b) is to provide an undersecured creditor an election with respect to the treatment of its deficiency claim. Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured claim for the entire amount of the debt. If separate classification of unsecured deficiency claims arising from non-recourse debt were permitted solely on the ground that the claim is non-recourse under state law, the right to vote in the unsecured class would be meaningless. Plan proponents could effectively disenfranchise the holders of such claims by placing them in a separate class and confirming the plan over their objection by cramdown. With its unsecured voting rights effectively eliminated, the electing creditor's ability to negotiate a satisfactory settlement of either its secured or unsecured claims would be seriously undercut. It seems likely that the creditor would often have to "elect" to take an allowed secured claim under § 1111(b)(2) in the hope that the value of the collateral would increase after the case is closed. Thus, the election under § 1111(b) would be essentially meaningless. We believe Congress did not intend this result.

- 10 -

Greystone III, 995 F.2d at 1280. Lastly, the Greystone court entertained the argument, also made in this case, that the Bankruptcy Code's policy favors reorganization, although resulting in a violation to §1122 by gerrymandering the plan vote in order to obtain a §1129(b) cramdown confirmation.

> Policy considerations do not justify preferring one section of the Code, much less elevating its implicit "policies" over other section, where the statutory language draws no such distinctions... If Phoenix's unsecured claim were lower and the trade debt were higher, or if there were other impaired classes that favored the plan, a cramdown plan would be more realistic. That Greystone's cramdown plan may not succeed on the facts before us does not disprove the utility of the cramdown provision.

Id.

In the case of National/Northway Limited Partnership, 279 B.R. 17 (Bankr. D. Mass. 2002) the court provided a summary of several opinions from bankruptcy courts in this circuit, written on this subject. The court, agreeing with the majority, concluded that a deficiency claim may not be separately classified from the other unsecured creditors. Judge Rosenthal in National/Northway agreed with Judges Goodman in In re Cantonwood, 138 B.R. 648, Hillman in In re L.G. Salem Ltd Partnership, 140 B.R. 132, and Kenner in In re Cranberry, 150 B.R. 289 and concludes that their decisions represent the approach that the First Circuit would adopt if faced with this issue. The court expressed that "[g]errymandering is still unacceptable, and in this circuit at least, because section 1122 remained unchanged, unsecured claims, whether trade or deficiency claims, must be classified together." National/Northway, 279 B.R. at 29.

After a careful review of the different opinions discussing this matter, this court agrees with the majority and rejects the position that the right to make an election under 1111(b) is sufficient to justify separate classification of the undersecured creditor's recourse claim, as there is no legal distinction between the deficiency claim and the other unsecured claims. The deficiency claim and the general unsecured creditors are treated equally, that is, both will be paid

in full. Thus, they should be placed in the same class. To classify the deficiency claim separately is only intended to obtain an accepting class.[3] Therefore, Caribbean's Plan improperly classifies the bondholders' deficiency claim.

2. Section 1129(a)(2) requires that the proponent of the plan complies with the applicable provisions of the Code. The disclosure and solicitation requirements are not challenged and the court finds that they have been fully met.

3. Section 1129(a)(3) requires that the plan be proposed in good faith and not by means forbidden by law. A "good faith plan" is "one which complies with and satisfies the goal of reorganization." *Collier on Bankruptcy*, ¶ 1129.03[3][a][ii]. "Section 1129(a)(3) speaks only to the proposal of a plan and does not address acceptance of such plan. Bad faith in the solicitation process seems to have been given over to section 1126(e) which recognizes the possibility of a bad faith acceptance." Id. The plan must be viewed in light of the totality of the circumstances. *Collier on Bankruptcy*, ¶ 1129.03[3][a][iii][A]. Good faith has been interpreted to mean "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Madison Hotel Associates, 749 F.2d 410 (7th Cir. 1984).

The Indenture Trustee argues that Caribbean's Plan does not treat the bondholders in a fair way because it "(i) proposes to pay the Indenture Trustee less than the amount to which it is entitled to receive as a distribution for its allowed secured claims and makes no provisions for the payment in full on the effective date as require (sic) under Section 1129(b); (ii) fails to propose fair distribution or any payment on the Indenture Trustee's unsecured claims, and improperly and arbitrarily classifies the deficiency claims and direct unsecured claim against Debtor ECMC and

---

[3] The beneficial holders have expressly voted against confirmation of Caribbean's Plan, even though it pays more to the deficiency claims. Had the deficiency claimants voted to accept the Plan, then the separate classification may have been irrelevant.

- 12 -

claims against Debtor HDA in classes treated as subordinate in priority to the general unsecured creditors and attempts to cap the deficiency claims despite no such cap on the proposed payment of other general unsecured claims; (iii) unfairly discriminates against the Indenture Trustee in the amount and timing of distributions; and (iv) forces the Indenture Trustee to incur a severe risk that the Caribbean plan will never be funded." Indenture Trustee's Opposition, Docket No. 1954, p 49.

Caribbean's Plan proposes to pay all creditors in full upon the effective date. Moreover, Caribbean's Plan, on its face, pays more to all creditors, including the bondholders, than the plan proposed by the Indenture Trustee. Consequently, the court rejects the argument made by the Indenture Trustee and finds that the plan has been proposed in good faith.

4. Section 1129(a)(4) requires that any payment to be paid under the plan for services or for costs and expenses in or in connection with the case, or the plan, has been approved or is subject to court approval, as reasonable. Caribbean's Plan offers to pay all creditors in full, thus, the amounts to be paid to Caribbean for costs and expenses related to these cases will not affect creditors. Under these circumstances the court finds that disclosure requirements have been fully met.

5. Section 1129(a)(5) requires disclosure and approval of the postconfirmation management of the revested debtor. The court finds that, since the debtors' assets will be sold to a new entity, the information disclosed by Caribbean, and its financial resources and license requirements, is sufficient to meet the requirements of section 1129(a)(5). Moreover, Caribbean has disclosed that upon confirmation of the Plan, Mr. Rafael Martinez Margarida will be appointed Plan Administrator. Thus, the required disclosures were made and are only subject to approval upon the entry of a confirmation order.

6. Section 1129(a)(6) requires that any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval. The court finds that this requirement does not apply to Caribbean's Plan as the income to fund the same comes from the sale of debtors' assets.

7. The Indenture Trustee argued at the confirmation hearing that Caribbean failed to meet its burden to establish the best interests of creditors requirements of Section 1129(a)(7) because it did not present evidence to prove that the unsecured creditors of ECMC and HDA will receive more than they would receive in a Chapter 7 liquidation. The evidence presented satisfies the court that should all the debtors be liquidated, unsecured creditors will not receive a distribution, and that even if there are any unencumbered assets in ECMC's or HDA's estate, any distribution will be *de minimis,* considering the combined value of debtors' estates. The value of the combined assets of the debtors does not exceed $70 million dollars as per stipulation filed and the secured claim of the Indenture Trustee is in the amount of $89 million. Therefore, the Indenture Trustee is an undersecured creditor and there is no equity in debtors' estates.

8. The requirements of section 1129(a)(8) have, admittedly, not been met because there are two classes in each of the two plans that rejected the same.

9. The Treasury Department of the Commonwealth of Puerto Rico (" Treasury") opposes the confirmation of Caribbean's Plan because such plan does not propose to pay its priority claim in its full amount as required by section 1129(a)(9). Caribbean's Plan proposes to pay priority tax claims from the Allowed Priority Tax Claim Reserve, which means $2,100,000.00 to be reserved for the payment of the priority tax claims. (See, Docket No. 2095 p. 2). Treasury's claim number 77 is for the total amount of $4,930,090.34, including the sum of $3,636,768.27

- 14 -

entitled to priority under 11 USC § 507(a)(8). Debtors and the Indenture Trustee objected to the amount of $2,607,426.34. The Camarero Racetrack and the Indenture Trustee filed a settlement withdrawing the objection to Treasury's claim but debtors' objection is still pending determination. (Docket No. 2122). However, Caribbean clarified to the court's satisfaction, through the testimony of Mr. Jose Monge Robertin, that there was an additional reserve for claims in relation to which objections are pending or on appeal, so that, if the objection is ruled in favor of Treasury, Caribbean will have sufficient funds to pay the claim in full as required. Consequently, the court finds that Caribbean's Plan complies with section 1129(a)(9).

10. Section 1129(a)(10) requires the acceptance of the plan by at least one class of impaired creditors. Caribbean's Plan fails to comply with this requirement for both debtors ECMC and HDA, considering this court's finding of Caribbean's improper classification of the bondholders' deficiency claim.

11. Section 1129(a)(11) requires that the proposed plan be feasible and that it is not likely to be followed by the liquidation, or the need of further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. Caribbean presented the testimony of Mr. Gabriel Montañez, Vice President of Westernbank's Business Credit Division, to establish that it had the financial resources to fund the plan. (See, Docket No. 2151 pages 6-67). Mr. Montañez was the underwriter of the Loan and Security Agreement (the "Loan Agreement"). (Ex. XII). The specific Loan and Security Agreement before the court was signed earlier in the morning of the second day of the confirmation hearing, that is, November 17, 2006.

The financing structure consists of a loan of $75,750,000 and capital contributions of $14,500,000 for a total of $90,250,000. From the total amount, the following must be deducted:

- 15 -

a suppressed availability of $250,000, a 1.5% closing fee or $1,136,750; and the balance remaining from the $5,000,000 capital expenditure reserve, or $3,400,000; for total deductions of $4,786,250. The available balance is $85,463,750. Mr. Montañez' testimony shows that of the $14,500,000 in capital contributions, only $7,350,000 had been deposited. The balance was in checks tendered on the day of the hearing and would be deposited on the next working day, excepting a check for $1,750,000, which, at the request of the investor, would be deposited within a week.

The Loan Agreement also calls for the borrower to maintain at all times an adjusted net worth of $11,500,000. The Loan Agreement provides in paragraph (q), page 16, for a capital contribution of up to $5,000,000 by the shareholders. As of the date of the hearing only Mr. Charles A. Cuprill had signed off on this provision.

One of the conditions precedent in the Loan Agreement is that the borrower's account receivable be in a condition acceptable to the lender. As of the date of the hearing the lender had not reviewed the same. Another condition precedent is that the shareholder agreement be acceptable to the lender. As of the date of the hearing, the lender had not reviewed the shareholders' agreement. Also, the lender had not received all the documents required to protect and perfect its security interest, specifically, the documentation respecting the ownership in the new company purchasing debtors' assets. The Loan Agreement also gives the lender the right to review the background checks on the borrower's shareholders. As of the day of the hearing the same had not been performed.

Mr. Montañez testified that he does not know of any reason that would prevent the closing of the loan and the disbursement of the funds. However, several conditions precedent, as outlined before, had not been met, and Caribbean has not submitted any subsequent evidence to

- 16 -

establish that they have been met.

This court has thoroughly analyzed the expected distribution under Caribbean's Plan as of November 30, 2006 and finds that Caribbean will have sufficient funds to pay all creditors in full, as proposed, if the financing agreement is finalized and the funds are made available to Caribbean. According to the testimony of Mr. Jose Monge Robertin, as provided in Exhibit IX, Caribbean will have available to distribute to creditors after confirmation the total amount of $86,103,750. Mr. Monge further testified that the total amount of claims expected to be allowed and reserves is $73,293,146, leaving a difference for contingent claims and claims pending court determination of $12,810,604. Mr. Monge states that, based on his analysis, the total amount of claims that are contingent and pending court determination amount to $12,059,519.21, for a leftover amount of $751,084.79.

The rebuttal testimony of Mr. Sutton showed that Mr. Monge failed to deduct certain amounts which Caribbean will need to pay in accordance with its plan. First, the loan agreement with Westernbank requires the amount of $250,000.00 as suppressed capital which needs to be deducted from the funds available at confirmation, for an adjusted total of $85,853,750. Mr. Sutton testified that the amount of claims expected to be allowed and reserves as per Caribbean's Plan of $73,293,146 needs to be adjusted as follows: an increase in administrative claims in the amount of $380,000 as noted in the debtors' Schedule of administrative expenses, an expected allocation of fees and expenses attributable to the bonds held by ECMC in the amount of $1,000,000 (11% of 9,000,000 in estimated fees and expenses for Noteholders) and the claim of Confederacion Hipica de Puerto Rico ("Confederacion") in the amount of $2,394,685 needs to be included with the unsecured creditors, plus 1,000,000 as part of the appealed orders. The total amount of Mr. Sutton's adjustments is approximately $5,024,685, which in turn is the

- 17 -

approximate amount of the shortfall of Caribbean's Plan.

On cross examination Mr. Sutton testified that in the administrative claims category he did not consider the amounts to be paid by debtors in the ordinary course, which will necessarily reduce the amount to be paid on the effective date. However, the professional fees estimates used by Mr. Monge did not contemplate legal and professional expenses after August, for example the fees generated by the litigation on the motion filed by debtors under 11 USC § 364(d) are not included, thus, it is clear the administrative claims will have to be adjusted although the exact amount is yet undetermined. The allocation of fees and expenses attributable to ECMC's bonds is certainly appropriate, although the exact amount is subject to the court's determination of reasonableness. See, Opinion and Order, Docket No. 2185, p. 8. The adjustment requiring the inclusion of Confederacion's claim is not appropriate because they agreed with Caribbean to be paid after the confirmation in 60 monthly installments the amount of $3,000,000, conditioned upon the assumption of their contract and confirmation of Caribbean's Plan. (Docket No. 2124) The contract with Confederacion has been assumed, thus if Caribbean's Plan is confirmed Confederacion will be paid as agreed. (Docket No. 1869) Wells Fargo argues that if Caribbean is not granted a license Confederacion's claim will have to be paid on the effective date, however this statement is not substantiated. Even though it is a possibility that Caribbean not be granted a license, if that is the case, according to the agreement with Confederacion, their claim will still be paid in 60 monthly installments.

Mr. Monge admitted in his testimony that if all claims pending court determination are allowed, Caribbean would need an additional $2 million to fund the plan as proposed. See, Transcript of hearing held on November 16, 2006, Docket No. 2193, p. 143. Mr. Sutton's testimony shows that the shortfall is of about $5,000,000. Mr. Monge maintains that it is highly

improbable that all disputed or contingent claims be allowed. Scientific Games alone has two claims for the total amount of $5,171,689.42 contingent upon the assumption of their contract by Caribbean. The contract with Scientific Games has been assumed, thus, if it is later rejected the penalty will become a post confirmation claim. (Docket No. 1869).

In view of the above, the court finds that the plan proponent did not meet its burden to show that the plan is feasible, because as of this date the evidence submitted to the court does not show that all the conditions precedent to the loan have been met.

12. The requirements of section 1129(a)(12) regarding the payment of fees is not questioned or opposed. Therefore, the court finds that the requirements are met.

13. Section 1129(a)(13) requires that the plan provides for the continuation of retiree benefits as the term is defined in section 1114 of the Bankruptcy Code. Section 1114(a) defines retiree benefits as "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." The debtors did not establish an employee retirement plan. Also, 401k plans and Individual Retirement Accounts (IRAs) are not the health and life retirement benefits envisioned by Section 1114. Therefore, section 1129(a)(13) is not applicable to Caribbean's Plan.

**Section 1129(b)**

Pursuant to Section 1129(b) a plan may be confirmed if all the requirements of 1129(a) are met, except 1129(a)(8), "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the

- 19 -

plan." As discussed above, Caribbean failed to meet the requirements of 1129 USC §§1129(a)(1), (8), (10) and (11), thus 1129(b) is inapplicable.

### Conclusion

The court concludes that Caribbean's Plan fails to meet the requirements of 11 U.S.C. §§ 1129(a)(1), (8), (10) and (11). Therefore, the confirmation of Caribbean's Plan is hereby denied.

SO ORDERED.

In San Juan, Puerto Rico, this 27th day of December, 2006.

_____
ENRIQUE S. LAMOUTTE
U.S. Bankruptcy Judge

- 20 -